In re BRISTOL–MYERS SQUIBB
SECURITIES LITIGATION

This Matter Pertains to All Cases.

No. 02 CIV. 2251(LAP).

United States District Court,
S.D. New York.

March 8, 2005.

Frederick Taylor Isquith, Sr., Gustavo Bruckner, Lawrence P. Kolker, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., Steven G. Schulman, Milberg Weiss Bershad & Schulman LLP, Daniel L. Berger, J. Erik Sandstedt, Javier Bleichmar, John P. Coffey, John Anthony Kehoe, Joseph Alberto Fonti, Max W. Berger, Bernstein, Litowitz Berger & Grossmann LLP, James V. Bashian, Law Offices of James V. Bashian, P.C., James W. Johnson, Goodkind Labaton Rudoff & Sucharow LLP, Aaron Lee Brody, Stull, Stull & Brody, Michael Andrew Fischer, Fischer Law Firm, PLLC, Robert Craig Finkel, Wolf Popper LLP, Frederick W. Gerkens, III, Lovell Stewart Halebian, LLP, Jeffrey M. Norton, Robert I. Harwood, Wechsler Harwood LLP, Linda P. Nussbaum, Susan R. Schwaiger, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Nadeem Faruqi, Faruqi & Faruqi, LLP, Mark C. Gardy, Nancy Kaboolian, Abbey, Gardy, L.L.P., David Corey Katz, Joseph H. Weiss, Richard Acocelli, Weiss & Yourman, New York City, David Avi Rosenfeld, Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, Melville, NY, Jeffrey Craig Block, Julie Richmond, Leslie F. Stern, Wendy H. Zoberman, Berman, Devalerio, Pease, Tabacco, Burg & Pucillo, LLP, Boston, MA, Mark E. King, David B. Kahn & Associates, Northfield, IL, John G. Emerson, Jr., Emerson Poynter LLP, Little Rock, AR, Marc A. Topaz, Schiffrin & Barroway, L.L.P., Evan Smith, Brodsky & Smith, L.L.C., Marc S. Henzel, Bala Cynwyd, PA, Brian M. Felgoise, Joshua H. Grabar, Bolognese & Associates, L.L.C., Robert M. Roseman, Spector, Roseman & Kodroff, P.C., Philadelphia, PA, Paul J. Geller, Cauley, Geller, Bowman & Coates, L.L.P., Boca Raton, FL, David R. Scott, James E. Miller, Neil Rothstein, Scott & Scott, L.L.C., Colchester, CT, Marc H. Edelson, Hoffman & Edelson, L.L.C., Doylestown, PA, Lionel Z. Glancy, Michael G. Goldberg, Glancy & Binkow, L.L.P., Los Angeles, CA, Patrick Anthony Klingman, Shepherd, Finkelman, Miller & Shah, LLC, Chester, CT, for Plaintiffs.

Elizabeth L. Grayer, Evan R. Chesler, Cravath, Swaine & Moore LLP, Richard M. Strassberg, Goodwin Procter LLP, Elliot Cohen, Stephen G. Rinehart, Jenkins & Gilchrist Parker Chapin LLP, Frederick P. Hafetz, Zachary Margulis Ohnuma, Hafetz & Necheles, Michael L. Hirschfeld, Scott Edelman, Thomas Andrew Areba, Milbank, Tweed, Hadley & McCloy, L.L.P., New York City, James O. Fleckner, Roberto M. Braceras, Goodwin, Procter, L.L.P., Boston, MA, for Defendants.

Alan R. Friedman, Amy Busa, Gary P. Naftalis, Kramer Levin Naftalis & Frankel LLP, Elliot Cohen, Robert Myer Carmen, Stephen G. Rinehart, Jenkens & Gilchrist, Parker, Chapin, L.L.P., Robert Ira Harwood, Wechsler Harwood LLP, New York City, for Movants.

*AMENDED OPINION AND ORDER*

PRESKA, District Judge.

Lead counsel for lead plaintiffs and the class ("Lead Counsel") have petitioned for reimbursement of their expenses incurred

in this class action and an allowance of fees in connection with the settlement approved at a fairness hearing held on November 9, 2004 (the "Fairness Hearing"). The fees and expenses requested by counsel were set forth in the notice of said hearing, and no objection was made by any Class Member.[1]

Lead Counsel have obtained for the Class a recovery of $300,000,000 (the "Settlement Fund"), of which Lead Counsel seek an award of 7.5%, net of approved notice costs and expenses, and reimbursement of litigation expenses in the amount of $557,580.75. At the Fairness Hearing, I reserved decision as to the fees and allowances to be made to Lead Counsel. For the reasons stated below, attorneys' fees are awarded to Lead Counsel in the amount of 4% of the Settlement Fund, or $11,937,696.78.

## BACKGROUND

The history of this case is set forth in detail in my April 1, 2004, Memorandum Opinion and Order. *See In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549 (S.D.N.Y.2004). I restate only those facts that are pertinent to this motion. On September 19, 2001, Bristol–Myers Squibb ("BMS" or the "Company") announced a $2 billion equity investment in ImClone pursuant to which the Company agreed to co-market and develop with ImClone the cancer treatment drug, Erbitux. Compl. ¶ 157.[2] However, on December 28, 2001, the Food and Drug Administration ("FDA") informed ImClone, by way of a "refusal-to-file" ("RTF") letter, that the FDA would not review the Erbitux Biologics License Application because the data submitted by ImClone was insufficient to support fast track approval at that time. Compl. ¶¶ 181, 187–88. On March 21, 2002, this action commenced with the filing of a class action complaint asserting that various of the Company's statements of optimism about the ImClone investment were false and misleading within the meaning of § 10(b) of the Securities and Exchange Act of 1934.

In April 2002, BMS issued its Form 10–K for the year ending December 31, 2001, in which it disclosed that certain of its domestic wholesalers had built up excess inventory of BMS' pharmaceutical products. Compl. ¶¶ 113, 123. Also during April, the SEC began an informal inquiry into BMS' wholesaler inventory buildup, which became a formal investigation in August 2002. Compl. ¶¶ 127, 130. On April 11, 2002, various plaintiffs filed a class action complaint alleging that the Company engaged in "a systematic program of moving sales from future periods [into the current period] in a process of what is sometimes called 'channel stuffing.'" April 11 Compl. ¶ 35.[3] In late October 2002, the Company announced that, based on the recent advice of its accountant, PricewaterhouseCoopers LLP ("PwC"), the Company expected to restate its financial statements for certain prior periods. Compl. ¶ 134; Grayer Decl. Ex. A at 48.[4] In a stipulation signed on November 27, 2002, and filed on December 5,

---

1. "Class Member" refers to each entity and person who purchased the common stock of Bristol–Myers Squibb during the period October 19, 1999 through March 10, 2003.

2. "Compl." refers to the Consolidated Class Action Complaint filed on April 11, 2003.

3. "April 11 Compl." refers to the complaint filed on April 11, 2002, under the caption

*David Wilmer v. Bristol–Myers Squibb Company, et al.*, 02 Civ. 2827(LAP).

4. "Grayer Decl." refers to the Declaration of Elizabeth Grayer in Support of Motion to Dismiss the Consolidated Class Action Complaint with Prejudice filed on October 14, 2003.

2002, the parties agreed that an amended consolidated complaint would be served two weeks after the Company restated its earnings.

On March 10, 2003, BMS publicly announced the expected scope and substance of its restatement, which was formally contained in three amended public filings submitted to the SEC on March 19, 2003: a Form 10–K/A for the year ended December 31, 2001, and Forms 10–Q/A for the three-month periods ended March 31, 2002, and June 30, 2002, (collectively, the "Restatement"). Compl. ¶ 2.

The parties entered into a stipulation and order on April 3, 2003, which modified the December 5 stipulation to give Lead Plaintiffs an opportunity to review the Company's amended 2002 10–Q filings. Accordingly, on April 11, 2003, Teachers' Retirement System of Louisiana, Louisiana State Employees' Retirement System, General Retirement System of the City of Detroit, and Fresno County Employees' Retirement Association (collectively, "Lead Plaintiffs") filed the Complaint. Defendants moved to dismiss the Complaint beginning on August 1, 2003. Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, discovery was stayed during the pendency of Defendants' motions to dismiss. Berger/Block Decl. ¶ 35.[5] On September 9, 2003, Lead Plaintiffs filed a single joint opposition to all pending motions to dismiss. Oral argument was held on March 29, 2004, and, on March 31, 2004, the motions to dismiss were granted, resulting in dismissal of the Complaint with prejudice.

Lead Plaintiffs filed a Notice of Appeal on April 28, 2004. While the appeal was pending, the parties engaged in settlement discussions which culminated in the Stipulation and Agreement of Settlement executed on July 29, 2004 (the "Stipulation"). Berger/Block Decl. ¶ 28. Just five days later, on August 4, 2004, the SEC announced the filing of a civil fraud action against BMS and the simultaneous settlement of that action. Berger/Block Decl. ¶ 31. Since that time, Lead Counsel and the SEC have worked cooperatively to distribute notices of settlement in both cases. Berger/Block Decl. ¶ 32.

Lead Counsel seek an award of attorneys' in the amount of 7.5% of the $300,000,000 Settlement Fund, minus $1,000,000 in approved notice costs and $557,580,75 in expenses incurred by Plaintiffs' Counsel, or $22,383,181.44. The fees sought result from two negotiations between Lead Plaintiffs and their counsel. The first negotiation occurred in preparation for the execution of retainer agreements with certain of the Lead Plaintiffs. Berger/Block Decl. ¶ 48; Lead Pl. Decl. ¶ 14.[6] That agreement provided for a fee of 15% of the total recovery if such recovery was obtained upon either a decision on a motion to dismiss or prior to the commencement of discovery. Lead Pl. Decl. Ex. 1. Sometime after the Stipulation was entered, "Lead Plaintiffs and Lead Counsel revisited the retainer agreement in view of the fact that the Complaint had been dismissed with prejudice," and they agreed to reduce the attorneys' fees by half, to 7.5%. Lead Pl. Memo. at 23,[7] Lead

---

5. "Berger/Block Decl." refers to the Joint Declaration of Daniel L. Berger and Jeffrey C. Block in Support of the Proposed Settlement, Plan of Allocation and Application for an Award of Attorneys' Fees and Reimbursement of Expenses filed on October 19, 2004.

6. "Lead Pl. Decl." refers to the Joint Declaration of William T. Reeves, Jr., Kevin Torres,

Ronald Zajac and Roberto Pena in Support of the Proposed Settlement, Plan of Allocation and Award of Attorneys' Fees and Reimbursement of Expenses dated October 12, 2004, and filed on October 19, 2004.

7. "Lead Pl. Memo." refers to the Memorandum of Law in Support of Lead Plaintiffs' Motion for Entry of Judgment Approving

Pl. Decl. ¶¶ 15–16, and Berger/Block Decl. ¶ 49. On October 19, 2004, Lead Counsel filed the present Motion for an Award of Attorneys' Fees and Reimbursement of Expenses.

## DISCUSSION

### A. The Standard

■ Attorneys who create a common fund from which members of a class are compensated are entitled to "a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir.2000) (internal citation omitted). Simple logic teaches that such a fee award depletes the amount by which the class is benefitted. *See Mautner v. Hirsch*, 32 F.3d 37, 40 (2d Cir.1994). Accordingly, I have a duty "to award fees with moderation and a jealous regard for the rights of those with an interest in the fund but who are not before the Court." *Burger v. CPC Intern., Inc.*, 76 F.R.D. 183, 188 (S.D.N.Y.1977).

■ The Court of Appeals has sanctioned the lodestar and percentage methods for calculating reasonable attorneys' fees in class actions. *Goldberger*, 209 F.3d at 50. Under both methods, the following factors are used to determine what constitutes a reasonable fee: (1) the risks of pursuing a case; (2) the complexity and uniqueness of the litigation; (3) the quality of representation; (4) counsel's time and effort; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Id.*

The lodestar method entails "scrutiniz[ing] the fee petition to ascertain the number of hours reasonably billed to the class and then multipl[ying] that figure by an appropriate hourly rate." *Id.* at 47 (citing *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999)). The resulting lodestar may then be increased by applying a multiplier based on the factors enumerated above. *Id.*

The second method is the far simpler percentage method, by which the fee award is "some percentage of the fund created for the benefit of the class." *Savoie*, 166 F.3d at 460. In determining what percentage to award, courts consider the same factors used to gauge the appropriate multiplier for the lodestar. *Goldberger*, 209 F.3d at 47. The percentage is lowered frequently where the common fund is large in order to avoid a perceived windfall for plaintiffs' counsel. *Roberts v. Texaco*, 979 F.Supp. 185, 195 (S.D.N.Y. 1997).

■ Typically, courts utilize the percentage method and then "cross-check" the adequacy of the resulting fee by applying the lodestar method. *See Goldberger*, 209 F.3d at 50. When used merely as a cross-check, the hours documented by counsel need not be thoroughly scrutinized, *see id.*, a process that Judge McLaughlin in *Goldberger* likened to "resurrect[ing] the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* at 49. Courts typically reduce the percentage of the fee as the size of the recovery increases and utilize the lodestar method to confirm that the percentage amount does not award counsel an exorbitant hourly rate. *See In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 465, 486, 489 n. 24 (S.D.N.Y.1998) (internal citations omitted).

### B. Application

■ The first, and most important, *Goldberger* factor is the risk in pursuing the case. *See Goldberger*, 209 F.3d at 54

Class Action Settlement and Plan of Allocation and Motion for an Award of Attorneys' Fees and Reimbursement of Expenses filed on October 19, 2004.

(quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d at 448, 471 (2d Cir.1974)); *see also Klein v. Salvi,* No. 02 Civ. 1862, 2004 WL 596109, at *7 (S.D.N.Y. March 30, 2004) (internal citations omitted). From Lead Counsel's perspective, "[t]he most obvious risk is the appeal that was pending prior to the Settlement." Lead Pl. Memo. at 15. However, it is well-settled that the risk of the litigation must be measured as of when the case is filed. *See Goldberger,* 209 F.3d at 55 (citing *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985); *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 583 (3d Cir.1984)). The risk that Lead Plaintiffs would not prevail on appeal after dismissal of the Complaint is, therefore, irrelevant to this inquiry.

Lead Counsel claim to have faced just two risks at the inception of the case: (1) failure to prove Defendants' intent to commit fraud; and (2) difficulty in proving the amount of damages. Lead Pl. Memo. at 15. The only fact presented by Lead Counsel in support of these risks—that the Complaint was dismissed for failure to plead scienter adequately—is a byproduct of hindsight and, consequently, does not demonstrate that such a risk was present at the time of their filing of a complaint. *Goldberger,* 209 F.3d at 54; *see* Lead Pl. Memo. at 15. In any event, proving scienter is one of the "general hurdles" facing plaintiffs in almost every securities case, *see Goldberger,* 209 F.3d at 54, except, perhaps, where a criminal conviction precedes the civil action. Thus, Lead Counsel have failed to set forth a single fact that was apparent prior to the commencement of the case that would demonstrate any unusual degree of risk in pursuing the action. To the contrary, the circumstances preceding the filing of the Complaint, set out below in the discussion of the complexities of this litigation, particularly the Company's restatement of its financials, support a finding that this case falls along the low end of the continuum of risk. *See id.*

Next, I consider the complexities and uniqueness of the litigation. Lead Counsel cite the necessity of proving the elements of securities fraud, the amount of damages, and the magnitude of the alleged fraud as evidence of the complexity of the litigation. *See* Lead Pl. Memo. at 31. Certainly, managing the large class of plaintiffs and reaching a $300 million settlement was not a simple task for Lead Counsel, but, in the realm of securities class actions, prosecution of this action was less complex than most. All of the alleged misstatements were easily found in the public record. The public expressions of optimism uttered by the Company and its officers provided the bases for the Erbitux claims and the financials laid bare the channel-stuffing claims. Similarly, the claims were precipitated by public events. The FDA's issuance of the RTF letter predated the Erbitux claims, and the restatement preceded the channel-stuffing allegations. Lead Counsel merely drafted complaints setting out roughly chronologically the material in the public record and alleging Defendants' knowledge and scienter. Neither the facts nor the legal and accounting theories were complicated. Among securities class actions, this case as a whole was neither unique nor complex. *Compare In re Visa Check/Mastermoney Litig.,* 297 F.Supp.2d 503, 523 (E.D.N.Y.2003) (finding magnitude and complexities of case "enormous"), *aff'd, Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir.2005); *In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393, 395 (S.D.N.Y.1999) (case involved "almost overwhelming magnitude and complexity"); *In re NASDAQ,* 187 F.R.D. at 474, 488 (finding that "liability in this case requires proof of an unusually complex conspiracy involving 37 Defendants and a 'checkerboard' of fact situations and disparate periods for each of

1,659 different securities" and that "the issues were novel and difficult requiring a challenge to a long-standing industry practice and the exercise of skill and imagination.").

The quality of representation in this case is not in dispute and in light of the relatively low level of complexity of the matter, neither favors nor disfavors counsels' fee application.

The fourth *Goldberger* factor is the time and effort expended by counsel. Pursuant to the PSLRA, discovery was stayed during the pendency of the motions to dismiss that resulted in dismissal of the case with prejudice. Berger/Block Decl. ¶ 35. Although Lead Counsel responded to Defendants' motions to dismiss and engaged in post-settlement confirmatory discovery, Lead Pl. Memo. at 14, this case is distinguishable from those relied on by Lead Counsel in support of a large fee award. *See* Lead Pl. Memo. at 26. For example, Plaintiffs' counsel in *In re Sumitomo Copper Litigation*, engaged in an investigation that involved the review and analysis of eleven million pages of documents, some seven million of which were in Japanese, located in London, Hong Kong, and Tokyo, and consulted extensively with more than ten experts over a period of more than three years without any governmental assistance. 74 F.Supp.2d at 395. Similarly, counsel in *NASDAQ* expended great effort in the necessary analysis of a complex conspiracy involving 37 defendants and 1,659 different securities. *See* 187 F.R.D. at 474, 488.

Here, Lead Counsel's pre-Complaint investigation consisted of: (1) interviewing dozens of witnesses familiar with the facts underlying the Complaint; (2) reviewing BMS' public filings and disclosures, press coverage, and market analyst reports; (3) analyzing the events and transactions alleged in the Complaint; (4) consulting with forensic accounting experts; and (5)

retaining and consulting with a damages expert. *See* Lead Pl. Memo. at 14. Although Lead Counsel, together with certain Plaintiffs' Counsel, reviewed over 2.3 million pages of documents in confirmatory discovery, Lead Pl. Memo. at 14, clearly, the record here is lacking the kind of detailed accounting analysis and impressive documentary volume that was present in *In re Sumitomo Copper Litigation* or the documentary volume and sophisticated analysis present in *NASDAQ*. Of course, confirmatory discovery occurred after settlement was agreed to and, while post-settlement confirmatory discovery can serve important purposes, it has "created a temptation for lawyers to run up the number of hours for which they can be paid." *See Goldberger*, 209 F.3d at 48. Given the timing and circumstances of this settlement, Lead Counsel have not satisfied their burden of persuading me that confirmatory discovery in this case was not make-work.

While Lead Counsel certainly expended considerable time and effort in reaching the settlement agreement set forth in the Stipulation, it is not thirty times more difficult to settle a thirty million dollar case as it is to settle a one million dollar case. *See id.* (quoting *Union Carbide*, 724 F.Supp. at 166). "A lawyer's fee should not be likened to a case of salvage, where reward is given to the successful finder, often with little regard to how much or how little effort the finder expended." *Klein*, 2004 WL 596109, at *11. The sequence of events in this case suggests that Lead Counsel's time and effort, while worthy, does not constitute the sort of extraordinary effort that might merit a large percentage fee award (particularly here, where the Settlement Fund out of which Lead Counsel will be paid contains almost $300,000,000). That the Complaint had been dismissed with prejudice and, while the appeal was pending, the parties

reached a settlement agreement that was executed just five days before filing and simultaneous settlement of the SEC action suggests that it was the Company's desire, prompted by the SEC, to put its house in order that caused the settlement, not any action on the part of Lead Counsel.

■ Finally, I consider whether public policy favors Lead Counsel's requested fee award. *See id.* Although in the abstract a 4.3 multiplier would not fall outside the spectrum of multipliers that have been deemed reasonable in cases relied upon by Lead Counsel, *see* Lead Pl. Memo at 29 (citing *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 371 (S.D.N.Y.2002) (4.65 multiplier); *Roberts,* 979 F.Supp. at 198 (5.5 multiplier); *Weiss v. Mercedes–Benz of N.A., Inc.,* 899 F.Supp. 1297, 1304 (D.N.J.1995) (9.3 multiplier)), fee awards should be assessed based on the unique circumstances of each case. *See Goldberger,* 209 F.3d at 52. Lead Counsel correctly argue that public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC. *See* Lead Pl. Memo. at 33 (citing *Bateman Eichler Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)). However, attorneys' fees that amount to more than four times the unscrutinized lodestar figure would provide far more than sufficient encouragement to plaintiffs' counsel, indeed, would provide a windfall, where there appears, at the commencement of the litigation, no more than the usual risk of non-recovery. The unique facts of this case support that view, given the timing of both the Complaint and the Stipulation. Lead Counsel suggest that refusing to grant their requested 7.5% fee [8] would amount to punishment that deters future such lawsuits, thereby stifling the purpose of securities laws and leaving harms without redress. Lead Pl. Memo. at 33. If reducing attorneys' fees to an amount that is reasonable in relation to the distinctive procedural history and the economics of this case amounts to punishment, "I am confident there will be many attempts to self-inflict similar punishment in future

8. As noted above, the 7.5% fee is the result of renegotiations with Lead Plaintiffs following dismissal of the Complaint. Contrary to Lead Counsel's argument, that the fact that the 7.5% fee was negotiated with institutional Lead Plaintiffs, *see* Lead Pl. Memo at 22–23, should not and, here, does not, lead to the conclusion that this percentage is presumptively fair. Despite the improvements intended by the PSLRA, "plaintiffs in common fund cases [generally remain] mere 'figureheads,' and the real reason for bringing such actions [remains] 'the quest for attorneys' fees.' " *Goldberger,* 209 F.3d at 53 (quoting Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America,* 42 Duke L.J. 945, 984 (1993) and citing to PSLRA). As Judge McLaughlin noted in *Goldberger,* neither the defendants nor the plaintiffs themselves have any incentive to expend resources to object to a fee request: "Defendants, once the settlement amount has been agreed to, have little interest in how it is distributed and thus no incentive to oppose the fee. Indeed, the same dynamic creates incentives for collusion—the temptation for the lawyers to agree to a less than optimal settlement 'in exchange for red-carpet treatment on fees.' And the class members—the intended beneficiaries of the suit—rarely object. Why should they? They have no real incentive to mount a challenge that would result in only a 'minuscule' *pro rata* gain from a fee reduction." *Goldberger,* 209 F.3d at 52–53 (internal citations omitted). The general rule recognized by Judge McLaughlin that neither plaintiffs nor defendants have much incentive to object holds true here where no one has opposed the fee request (despite the fact that, for example, plaintiff New York State Teachers' Retirement System has objected to fee requests in the past, *e.g., In re AMF Bowling Securities Litigation,* 334 F.Supp.2d 462 (S.D.N.Y.2004); *In re DPL Inc. Securities Litigation,* 307 F.Supp.2d 947 (S.D.Ohio 2004)). In any event, the fact that Lead Plaintiffs negotiated a 7.5% fee is not persuasive here.

cases." *See In re Visa Check/Mastermoney Litig.*, 297 F.Supp.2d at 525.

The lodestar figure in this case is $5,192,155.10. That a fee award of $11,937,696.78 results in a quite reasonable multiplier of 2.29 further convinces me that this award is reasonable. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir.2001) (finding that a survey of cases with megafunds over $100 million shows that lodestar multipliers of 1.35 to 2.99 are common).

 Having considered all of the factors set forth in *Goldberger* and having cross-checked the resulting fee by way of the lodestar method, I find that a fee of $11,937,696.78 to be paid out of the Settlement Fund is reasonable. Lead Counsel's motion for reimbursement of expenses in the amount of $557,580.75, to be paid out of the Settlement Fund as well, is also granted.

### CONCLUSION

For the reasons set forth above, Lead Plaintiffs' Motion for Attorneys Fees and Reimbursement of Expenses is granted, to the extent noted in the foregoing Opinion and Order.

SO ORDERED.