**In re ELAN SECURITIES
LITIGATION.**

No. 02 Civ. 0865(RMB).

United States District Court,
S.D. New York.

April 20, 2005.

Daniel R. Karon, Einstein, Kitchenoff, Scarlato, Karon & Goldman, Ltd., Cleveland, OH, Frederick Taylor Isquith, Sr, Gregory M. Nespole, Adler, Freeman & Herz, L.L.P., New York, NY, Gustavo Bruckner, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, Marc Ian Gross, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, for Barry Pinkowitz.

Laura M. Perrone, Law Offices Of Laura M. Perrone, P.L.L.C., New York, NY, Marc Ian Gross, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, for Jerry Krim.

Marc Ian Gross, Pomerantz Haudek Block Grossman & Gross LLP, New York, NY, for Wiliam T. Seufert.

Mitchell Alan Karlan, Gibson, Dunn & Crutcher LLP, New York, NY, Neil L. Selinger, Richard Bemporad, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, for Elan Corporation, PLC, Donald Geaney, Thomas Lynch, Shane Cooke, KPMG LLP, William Daniel, William Browning.

Neil L. Selinger, Richard Bemporad, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, for Christopher Tighe.

Frederic Scott Fox, Kaplan, Fox & Kilsheimer, LLP, New York, NY, for Gregory Van Kipnis.

Jules Brody, Stull Stull & Brody, New York, NY, for the Schutt.

Frederic Scott Fox, Kaplan, Fox & Kilsheimer, L.L.P., New York, NY, for S & T Investment Co., City of Monroe Employees' Retirement System, Dr. Norman Lefkowitz.

Frederick Taylor Isquith, Sr, Gregory Mark Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY, for Fox Asset Management.

Charles D. Chalmers, MILL VALLEY, CA, for Doyle Barnes.

## DECISION AND ORDER

BERMAN, District Judge.

### I. Introduction

This consolidated securities law action was initiated on February 4, 2002 by a putative class of plaintiffs ("Plaintiffs," "Class," or "Class Members") who purchased the common stock of Elan Corporation ("Elan"), an Irish pharmaceutical company, in the open market or as the result of merger(s). On January 24, 2003, Plaintiffs filed a consolidated complaint ("Complaint") claiming that during the period February 7, 2000 through July 1, 2002 ("Class Period"), Elan's revenue (for fiscal years 1999 through 2001) was overstated in public filings by at least $648.8 million, artificially inflating the price of Elan's American Depository Shares ("ADSs"). Plaintiffs asserted claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as amended ("Securities Act"), and Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), against Elan, four of its executives, Donal L. Geaney, Thomas G. Lynch, Shane M. Cooke, and William F. Daniel, Elan's outside auditor, KPMG, Chartered Accountants ("KPMG–Ireland"), and a related United States entity, KPMG LLP ("KPMG–US") (collectively, "Defendants").[1]

On November 1, 2004, Plaintiffs moved (1) pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), for final approval of settlement of the instant action for $75 million ("Settle-ment"); and (2) pursuant to Fed.R.Civ.P. 23(h) and 54(d)(2), for an award of attorneys' fees to Plaintiffs' counsel ("Class Counsel") in the amount of 20% of the Settlement or $15 million, plus $505,398.33 in expenses ("Class Counsel's Fee Application"). (See Lead Plaintiffs' Memorandum of Law for Final Approval of Proposed Settlement, dated Nov. 1, 2004 ("Pl.Set-tle.Mem."); Lead Plaintiffs' Memorandum of Law for an Award of Attorneys' Fees and Reimbursement of Expenses, dated Nov. 1, 2004 ("Pl. Fee Mem.").)

From December 31, 2004 through February 18, 2005, the Court received written objections ("Objections") from Class Members ("Objectors") to the Settlement and/or Class Counsel's Fee Application. (See Memorandum of Class Member Doyle Barnes In Opposition to Class Counsel's Fee Application, dated Jan. 10, 2005 ("Barnes Mem."); Barnes Amended Report on Class Counsel's Lodestar and Costs, dated Jan. 24, 2005 ("Barnes Report").) On or about January 21, 2005, Plaintiffs filed a response to the Objections. (See Co–Lead Plaintiffs' Responses to Objections, dated Jan. 21, 2005 ("Pl.Response").) On February 4, 2005, Charles D. Chalmers, Esq. ("Chalmers"), representing Objector Doyle Barnes ("Barnes"), filed a separate fee application for $121,575 in legal fees, plus $4,001.41 in expenses. (Motion for Attorney Fees and Costs, dated Feb. 4, 2005 ("Chalmers's Fee Application").) On February 11, 2005, Plaintiffs filed a supplemental response to the Objections and a memorandum of law

---

1. The action originated before Judge Whitman Knapp and was reassigned to this Court on or about April 16, 2003, following Judge Knapp's death. The Court assumes familiarity with the factual and procedural history of this case, as set forth in prior decisions. See In re Elan Corp. Secs. Litig., 2004 WL 1303638 (S.D.N.Y. May 18, 2004) (Maas, M.J.) (denying Plaintiffs' request to lift mandatory stay of discovery); In re Elan Corp. Secs. Litig., 2004 WL 1305845 (S.D.N.Y. May 18, 2004) (Maas, M.J.) (report and recommendation recommending the grant in part and denial in part of Defendants' motion to dismiss); In re Elan Corp. Secs. Litig., 2002 WL 31720410 (S.D.N.Y. Dec.3, 2002) (Maas, M.J.) (appointing lead plaintiff and lead counsel); see also Pinkowitz v. Elan Corp., PLC, 2002 WL 1822118 (S.D.N.Y. July 29, 2002) (Knapp, D.J.) (order of consolidation).

opposing Chalmers's Fee Application. (Supplemental Response of Lead Plaintiffs to Additional Fee Petitions and Other Matters, dated Feb. 11, 2005 ("Pl.Supp.Response").)

On February 18, 2005, the Court held a fairness hearing pursuant to Fed.R.Civ.P. 23(e)(1)(C) ("Fairness Hearing") at which the Court heard from two Objectors as well as from Plaintiffs and Defendants. (*See* Transcript of Fairness Hearing, dated Feb. 18, 2005 ("Tr.").)

**For the reasons set forth below, the motion for final approval of the Settlement is granted; Class Counsel's Fee Application is granted in part and denied in part; and Chalmers's Fee Application is granted in part and denied in part.**

## II.  Background

Approximately thirty securities fraud class actions were filed following, among other things, publication in *The Wall Street Journal* of an article on January 30, 2002 describing Elan's allegedly questionable accounting practices, and Elan's announcement on February 4, 2002 of lower earnings forecasts. (Plaintiffs' Joint Declaration, dated Dec. 1, 2004 ("Pl.Decl."), ¶¶ 26–35; Declaration of Charles D. Chalmers, dated Jan. 10, 2005 ("Chalmers Decl."), Ex. C: Jesse Eisinger, *Elan's Revenue Gets a Quick Lift From Its Complicated Accounting*, The Wall Street

Journal, Jan. 30, 2002 (Elan's "50 research and development joint ventures . . . simultaneously shift R & D research costs off Elan's books and allow Elan to book revenue long before the ventures have developed any products to sell").) [2] On or about July 29, 2002, Judge Knapp consolidated these actions pursuant to Fed.R.Civ.P. 42(a) and referred to Magistrate Judge Frank Maas the parties' motions for the appointment of lead plaintiff and lead counsel under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Pinkowitz*, 2002 WL 1822118, at *4–5. On December 3, 2002, Judge Maas appointed the S & T Investment Company and Dr. Norman Lefkowitz as "Lead Plaintiffs," and the law firms of Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") and Pomerantz, Haudek, Block, Grossman & Gross, LLP ("Pomerantz Haudek") as "Lead Counsel." [3] *See In re Elan*, 2002 WL 31720410, at *5. On or about December 11, 2002, Judge Maas appointed Plaintiffs Gregory Van Kipnes, Michael Pennock, Randy Spokane, and Charles Tighe as members of "Plaintiffs' Executive Committee," and he appointed the firms of Kaplan, Fox & Kilsheimer LLP, Glancy, Binkow & Goldberg, LLP, and Berger & Montague, P.C. as counsel to Plaintiffs' Executive Committee. (Pretrial Order Regarding Plaintiffs' Executive Committee, dated Dec. 11, 2002 ("Pretrial Order").) [4]

---

2.  On February 7, 2002, Elan also announced that the Securities and Exchange Commission ("SEC") had begun an investigation into Elan's finances. (Chalmers Decl. Ex. D: Elan Press Release, dated Feb. 7, 2002.)

3.  Although Milberg, Weiss, Bershad, Hynes & Lerach, LLP was originally appointed Co-Lead Counsel, Lerach Coughlin assumed that position upon the dissolution of Milberg, Weiss. (Settle. at 3 n. 2.)

4.  Pursuant to the Pretrial Order, Plaintiffs Randy Spokane and Michael Pennock and

their counsel, Glancy, Binkow & Goldberg, LLP, were appointed (jointly with Lead Plaintiffs and Lead Counsel) to prosecute claims arising from the mergers of Elan with The Liposome Company, Inc. ("Liposome") and Dura Pharmaceuticals, Inc. ("Dura"). (Pretrial Order ¶ 4 ("[P]rosecution of the claims arising from [Elan's mergers with Liposome and Dura] shall be [the] responsibility of Randy Spokane, Michael Pennock and their counsel, Glancy & Binkow, LLP *jointly* with Lead Plaintiff and Lead Counsel.").)

The Complaint alleged that "Elan inflated its revenues and earnings through several manipulative accounting schemes, most of which involved Elan investing monies in, or loaning monies to, other entities (*e.g.*, joint business ventures) which then funneled the same monies back to Elan by 'purchasing' Elan products or licenses. The common thread among these schemes was that all of the initial funding that Elan conveyed to the separate entities was immediately returned to Elan and booked as revenue, while Elan booked its payments to the entities as capital investments or loans." (Compl.¶ 26.) The Complaint asserted that "this 'round tripping' of Elan's own funds … generated enormous one-time profits that materially distorted the Company's performance picture." (*Id.*) Plaintiffs sought certification of a class consisting of all those who purchased Elan ADSs during the Class Period, as well as certification of two subclasses consisting of investors who acquired Elan ADSs as a result of Elan's acquisitions of Liposome and Dura ("Liposome Subclass" and "Dura Subclass"). (Compl.¶ 226.)

On March 25, 2003, Defendants moved to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) and 9(b) and the PSLRA. Defendants' motion was referred to Judge Maas who issued a Report and Recommendation, dated May 18, 2004 ("Dismissal R & R"), recommending the dismissal, with leave to replead, of Plaintiffs' Securities Act claims, Section 14(a) claim, all claims against the KPMG Defendants, and most of the allegations underlying the Section 10(b) and 20(a) claims. *In re Elan*, 2004 WL 1305845. Judge Maas recommended sustaining the claims under Sections 10(b) and 20(a) based upon the failure to disclose: (1) Elan's June 2000 sale to Pharma Marketing, Inc. ("Pharma") of the royalty rights of five key drug products; (2) Pharma's reimbursement of Elan's research and development costs for those products; and (3) that certain of Elan's 2001 "Prod-uct Rationalization Program" transactions were financed entirely by Elan. *Id.* at *3–4, 16–28; Pl. Decl. ¶ 58. Judge Maas also denied Plaintiffs' request to lift the stay of discovery, *In re Elan*, 2004 WL 1303638, with the result that no formal discovery has been conducted (Pl. Settl. Mem. at 11 n. 4).

The parties engaged in lengthy settlement negotiations commencing in or about March 2004, including a two-day mediation before retired District Judge Nicholas J. Politan on August 23 and 24, 2004. (Pl. Decl. ¶¶ 66–68, 70–71; Supplemental Joint Declaration, dated Jan. 5, 2005 ("Pl.Supp. Decl."), ¶¶ 33–39.) They appear to have agreed to settle the matter some time in September 2004. (Lead Counsel's Letter to the Court, dated Sept. 15, 2004.) "At the time the Settlement was reached, … the SEC, whose Office of Compliance had been investigating the Company since March 2002, had provisionally reached an accord that would require … Elan to pay a $15 million fine, but would not require any accounting restatement that could benefit [this] Litigation." (Settle. Mem. at 4; Pl. Decl. ¶ 67.) On or about October 21, 2004, the parties executed the proposed Settlement, and on October 29, 2004, the Court entered an order preliminarily approving the proposed Settlement and the form and manner of notice to the Class. (Order Preliminarily Approving Settlement, dated Oct. 29, 2004 ("Preliminary Order"), ¶ 2 ("The terms of the Stipulation, and the Settlement provided for therein, are preliminarily approved.").)

The Settlement and Preliminary Order provide in part the following:

- Defendants will pay $75 million into a "Settlement Fund" to be held in an interest-bearing escrow account. (Settle.¶¶ 2–3.)
- Certification of a "Settlement Class" consisting of all injured investors in

Elan ADSs during the period February 7, 2000 to July 1, 2002, including, without limitation, Liposome and Dura Subclasses. (Settle. ¶¶ 1.12, 4.1; Prelim. Order ¶ 1(a).)

- Mailing of the "Notice of Pendency and Settlement of Class Action" ("Notice") and "Proof of Claim and Release" (Settle. Exs. A and B) to all known Class Members, and posting the Stipulation and all exhibits on an internet website established by the Settlement Administrator, Berdon Claims Administration LLC. (Settle. ¶ 1.11; Prelim. Order ¶¶ 3–5.) Publication, on or before November 15, 2004, of a copy of the "Summary Notice" (Settle.Ex. C) twice in the national edition of *Investor's Business Daily*. (Prelim. Order ¶ 5(b).)

- The Notice described, among other things, the claims being settled, the Settlement Fund, Class Counsel's proposed fees, the process of filing Objections, the right to appear at the Fairness Hearing on February 18, 2005 to determine whether the Settlement is "fair, reasonable, and adequate," and the requirement that Proofs of Claim and Releases be submitted by March 15, 2005. (Prelim. Order ¶¶ 2, 7–8, 10; Settle. ¶ 6.3; Affidavit of Michael Rosenbaum, dated Nov. 29, 2004 ("Rosenbaum Aff."), Ex. A: Notice.)[5]

- The proposed Plan of Allocation among the Settlement Class and Subclasses was also described in the Notice, including a "premium" for claims arising out of the Liposome and Dura mergers. (Notice § VII; Pl. Decl. ¶¶ 72–77, 148; Pl. Settle. Mem. at 20.)

The Settlement Administrator effected Settlement Notice from November 8, 2004 through December 30, 2004 by, among other things, mailing over 400,000 Notices to potential Class Members. (Declaration of Marlene Hurwitz, dated Jan. 19, 2005 ("Hurwitz Decl."); *see also* Rosenbaum Aff. ¶¶ 2–6.) According to Plaintiffs, only 48 Class Members opted out of the Settlement. (Plaintiffs' Letter to the Court, dated Feb. 16, 2005.) The Court received approximately 17 Objections from Class Members, 15 of whom objected solely to Class Counsel's Fee Application.[6]

At the February 18, 2005 Fairness Hearing, the Court first heard from (all) Objectors in attendance, namely, Barnes and David E. Kaplan ("Kaplan"), both of whom "urge[d] approval of this settlement" but objected to Class Counsel's fees. (Tr. at 2, 14.) Plaintiffs spoke in favor of the Settlement (*id.* at 21–31), and Defendants did not "wish to be heard" (*id.* at 31). Plaintiffs estimated that Defendants' potential liability in this case would be $361 million, while Defendants estimated their potential liability (exposure) to be approximately $151 million. (Pl. Decl. ¶¶ 142–47; Pl. Settl. Mem. at 1, 17 & n. 7.)

### III. Legal Standard

■■■ In determining whether to approve a class action settlement, the district court must determine whether it is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir.2000). "The District Court determines a settlement's fairness by examining the negotiating process leading up to the settlement as well as the

---

5. The Notice stated that Class Counsel would seek attorneys' fees of up to 25% of the Settlement Fund. (Notice § XI.)

6. At least one Objector requested that his Objection be withdrawn. (*See* Nicholas Fausto Letter to the Court, dated Feb. 16, 2005; *see also* Marc Gross Letter to Samuel Rothman, dated Feb. 11, 2005.)

settlement's substantive terms." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.2001). Judicial discretion should be exercised in light of "the general policy favoring the settlement of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982).

■■■ District courts first review the negotiating process that produced the settlement to ensure: (1) that the settlement was the product of arm's length negotiations; and (2) that class counsel " 'possessed the experience and ability, and ... engaged in the discovery, necessary to effective[ly] represent[ ] ... the class's interests.' " *D'Amato*, 236 F.3d at 85 (quoting *Weinberger*, 698 F.2d at 74). Once the court determines that the settlement is procedurally fair, adequate and reasonable, it must determine whether the settlement is substantively fair, adequate and reasonable by considering the following nine factors enumerated initially in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

*D'Amato*, 236 F.3d at 86 (citations omitted).

"[P]ublic policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." *In re Bristol–Myers Squibb Secs. Litig.*, 361 F.Supp.2d 229, 236 (S.D.N.Y. 2005). A party seeking attorneys' fees bears the "burden of 'establishing entitlement to an award. ...' " *Savoie v. Merchants Bank*, 166 F.3d 456, 463 (2d Cir. 1999) (citation omitted).

## IV.  Analysis

### A.  *The Settlement Should Be Approved*

■■■ Lead Counsel, Lerach Coughlin and Pomerantz Haudek, have extensive experience in handling complex plaintiffs' class actions, and the Court has no reason to question that the Settlement was the product of extended "arm's length" negotiations, including, among other things, the two-day settlement conference before Judge Politan. *See States of N.Y. and Md. v. Nintendo of America, Inc.*, 775 F.Supp. 676, 680–81 (S.D.N.Y.1991). Where "the Court finds that the Settlement is the product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation, the Settlement will enjoy a presumption of fairness." *In re Austrian and German Bank Holocaust Litigation*, 80 F.Supp.2d 164, 173–74 (S.D.N.Y.2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).

The first Grinnell factor favors the Settlement. The action involves litigation of complex liability, accounting and damages issues. (*See, e.g.*, Dismissal R & R.) Significant time, effort, and expense would be incurred were the case to go forward, including, among other things, litigation of Judge Maas's Dismissal R & R, extensive discovery, much of which would take place outside the Court's subpoena power in Ireland, expert reports, (likely) summary judgment motions, and ultimately a lengthy trial. *See, e.g., In re Visa Check/ Mastermoney Antitrust Litig.*, 297

F.Supp.2d 503, 510 (E.D.N.Y.2003) (describing potential for "enormous expense" in proceeding to trial), *aff'd sub nom Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir.2005).

The second *Grinnell* factor—*i.e.,* "reaction of the class to the settlement"—strongly favors approval of the Settlement. In response to over 400,000 separately mailed Notices, only 48 Class Members opted out of the Settlement and only two Class Members submitted Objections to the terms of the Settlement (as opposed to objecting solely to counsel's fees).[7] (*See* page 7, *supra.*) In fact, both Objectors who appeared at the Fairness Hearing urged approval of the Settlement (*see* Tr. at 2 ("Mr. Barnes urges approval of this settlement."); Tr. at 14 (Kaplan "urge[s] approval of this settlement")). *See, e.g., D'Amato,* 236 F.3d at 86–87 ("The District Court properly concluded that this small number of objections [18 out of 27,883 notices sent] weighed in favor of the settlement."); *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 478, 482 n. 20 (S.D.N.Y.1998) (describing as "minimal" 3,874 opt-outs from a class of over one million, or .39%).

The third *Grinnell* factor—*i.e.,* "the stage of the proceedings and the amount of discovery completed"—also supports the Settlement. Although there has been little or no formal discovery to date, Class Counsel has, among other things, interviewed former Elan employees, received and analyzed hundreds of thousands of pages of documents and deposition summaries produced by Elan in connection with the SEC investigation, worked with forensic accountants to evaluate the alleged financial improprieties, and retained two experts to analyze potential damages. (Pl. Decl. ¶¶ 45, 69, 72–75; Pl. Settl. Mem. at 10–11.) Plaintiffs have "sufficient information to make an informed judgment on the reasonableness of the settlement proposal." *Diamond v. Fogelman,* No. CV–90–0900, 1992 WL 167271, at *4 (E.D.N.Y. June 26, 1992).

The fourth through seventh *Grinnell* factors—*i.e.,* the risks faced by the Class in establishing liability and damages, in maintaining the class action through trial, and in collecting upon any judgment—all favor settlement. Plaintiffs faced significant litigation risks because, among other things: (i) Judge Maas recommended dismissal (with leave to replead) of many of Plaintiffs' claims; (ii) "Defendants insist[ ] that the market was aware of many of the matters Lead Plaintiffs asserted had not been disclosed, and would ... point[ ] to a number of analyst reports that consistently questioned the quality of Elan's reported earnings"; and (iii) it might have been difficult to establish Defendants' scienter. (Pl. Settl. Mem. at 4, 12–16; *see* Pl. Decl. ¶¶ 78–141.) Also, the SEC, which had been investigating Elan since no later than March 2002, announced on February 8, 2005 that Elan had agreed to pay a $15 million fine but did not require any accounting restatement that could have benefitted this litigation. (Pl. Settle. Mem.

7. The two Objections complained that Class Members had insufficient time to object. (*See* Objection of Roger and Christine Braugh, dated Jan. 7, 2005; Objection of James E. Gorman, dated Jan. 4, 2005.) The Court finds that Class Members did have enough time to object prior to January 10, 2005 because nearly all of the Notices were mailed by early December 2004, and the entire mailing was completed by December 30, 2004. (*See* Hurwitz Decl.) Moreover, the Court considered all Objections received through February 18, 2005, the date of the Fairness Hearing. *See, e.g., Thompson v. Metropolitan Life Ins. Co.,* 216 F.R.D. 55, 67 (S.D.N.Y.2003) ("The appearance and argument by counsel on behalf of these objectors at the fairness hearing belies their claim that the notice denied them the opportunity [to] object....").

at 4; Pl. Supp. Response at 3; *see also* Chalmers Decl. Ex. G.)

The eighth and ninth *Grinnell* factors relating to "the range of reasonableness of the settlement fund in light of the best possible recovery" and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation" also favor the Settlement. *Grinnell*, 495 F.2d at 455 (" 'The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.' ") (citation omitted). The $75 million Settlement Fund "represents 50% of Defendants' estimate of damages [$151 million], and over 21% of Lead Plaintiffs' estimate of damages [$361 million]." (Pl. Settl. Mem. at 1, 17 & n. 7; Pl. Decl. ¶¶ 142–47.) Thus, taking into account all of the *Grinnell* factors, the Court finds the Settlement to be fair, reasonable, and adequate to the Class.

The Court also approves the Plan of Allocation (*see* page 7, *supra* ) because, among other reasons, it was negotiated at arm's length among representatives of the Class and the Subclasses and Defendants; it is supported by experienced and competent counsel; and no Class Members have objected. *See, e.g., In re American Bank Note Holographics, Inc.*, 127 F.Supp.2d 418, 429–30 (S.D.N.Y.2001) (approving settlement plan of allocation because, among other things, "the opinion of experienced and informed counsel is entitled to considerable weight" and "the lack of any objections suggests that approval ... is warranted").

**B. *Class Certification***

The Court provisionally certified the Class in the Preliminary Order, and no Class Member has objected to certification. (*See* pages 6–7, *supra*.) Pursuant to

Rule 23(a), plaintiffs must satisfy each of four prerequisites in order to secure class certification: numerosity, commonality, typicality, and adequacy of representation. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Plaintiffs also "must qualify under one of three criteria set forth in Rule 23(b)." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997).[8]

The Settlement Class clearly satisfies Rule 23(a). It is "impracticable" to join the more than 400,000 Class Members who received Settlement Notices. *See, e.g., Varljen v. H.J. Meyers & Co.*, No. 97 Civ. 6742, 2000 WL 1683656, at *2 (S.D.N.Y. Nov.8, 2000). Plaintiffs allege numerous questions of law and fact that are "common to the class," including whether Defendants engaged in "round trip" accounting improprieties in order to inflate the price of Elan ADSs during the Class Period. *Id.* Plaintiffs' claims stem from similar events and rely on similar legal arguments. *See Marisol A.*, 126 F.3d at 376 (commonality and typicality "tend to merge into one another"). And, Class Counsel are "qualified, experienced, and generally able to conduct the litigation." *Id.* at 378.

The Court also finds that Rule 23(b)(3) is satisfied because "questions of law [and] fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3); *see Amchem*, 521 U.S. at 623, 625, 117 S.Ct. 2231.

**C. *Class Counsel's Fee Application***

Class Counsel seek attorneys' fees in the amount of 20% of the $75 million Settle-

---

8. In this case, Plaintiffs seek certification under Rule 23(b)(3) based upon common questions of law and fact. (Pl. Settle. Mem. at 21–24.)

ment Fund (or $15 million), plus $505,398.33 in expenses, which is proposed to be shared among 29 law firms.[9] Class Counsel claims a lodestar of $3,174,263 based upon 8,697 hours worked (including lawyers and paralegals) (Pl. Decl. ¶ 149 & Ex. A), and seeks a lodestar "multiplier" of 4.72 (Pl. Fee Mem. at 9). Plaintiffs argue that Class Counsel's Fee Application should be granted because, among other reasons: (1) the "20% fee requested is at the low end of the 20–30% range generally awarded in securities fraud class actions" (Pl. Response at 3); (2) reducing the fee would "effectively penalize counsel for deciding not to pursue depositions and third party discovery rather than settling for a significant sum at a relatively early stage of the litigation" (id. at 1); (3) "[t]he risk of a significantly smaller recovery, or no recovery at all, was particularly high in this case" (Pl. Fee Mem. at 18) because Judge Maas "recommended dismissal of a significant portion of the claims asserted," "the SEC did not compel any accounting restatement," "Plaintiffs would have been hard pressed to recover most of the decline in Elan's ADSs following the initial disclosures," and "Elan's financial condition significantly deteriorated as the case proceeded" (Pl. Response at 13–14); (4) the Court should compensate counsel who were not appointed by the Court as Lead Counsel or as counsel to Plaintiffs' Executive Committee ("Unappointed Counsel") whose (only) "contribution was filing of complaints at the outset of the litigation" because such filings "demonstrat[ed] to [Elan] the intense outrage experienced by American investors" (id. at 9); and (5) Class Counsel's expenses "were reasonably incurred and necessary" (Pl. Fee Mem. at 24).

While all 17 Objections opposed Class Counsel's Fee Application, only Objectors Barnes and Kaplan offer detailed and substantive grounds for their opposition. Barnes argues that a fee of "not more than 10%" of the Settlement Fund (and "no more than a multiplier of three") is appropriate (Tr. at 4, 11) because, among other reasons: (1) a 20% fee (amounting to an average of $1,724 per hour "for every partner, associate and paralegal") "would be a 'windfall' in this early settled, routine, securities case" (Barnes Mem. at 1–3); (2) "reputable counsel will take these cases for more modest compensation" (id. at 18); (3) Class Counsel faced only a "modest risk of dismissal," and "[t]here is no indication that the financial community viewed Elan as in financial difficulty or likely to fail" (id. at 11); (4) the Court should reject the lodestar and expenses of Unappointed Counsel that "were not appointed to any role in the case" (id. at 21–22); and (5) Class Counsel's expense request should be reduced (id. at 23–24; Barnes Report at 3–4).

Objector Kaplan originally supported a 15% fee award (Kaplan Notice of Objection, dated Dec. 31, 2004, at 1), but later argued in favor of awarding only appointed counsel's lodestar with no multiplier (Kaplan's Reply Memorandum, dated Feb. 14, 2005 ("Kaplan Reply"), at 9; Tr. at 17, 21). Kaplan asserts, among other things: "[t]his case was filed in response to an article in *The Wall Street Journal* on January 30, 2002 that essentially rehashed assertions about Elan's accounting structure that were well known to the market" (Kaplan Reply at 4); "[v]irtually all" of Class Counsel's time was "spent waiting for the SEC to act" (id. at 8); the Settlement was "extracted ... simply because Elan sought to get this matter, and the related seemingly interminable SEC investigation, behind it" (id. at 2); and "Elan

9. Class Counsel originally sought $525,398 in expenses but reduced that figure by $20,000 after Objector Barnes pointed out an arithmetic error. (Pl. Response at 4 n. 2.)

was never in 'dire financial condition' " (*id.* at 7).

■ Attorneys who create a "common fund" are entitled to "a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir.2000). Under the lodestar method, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Id.* The lodestar may be increased "by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* (citations omitted). Under the percentage method, the "court sets some percentage of the recovery as a fee," but "look[s] to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Id.*

■ "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation. In contrast, the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 123

(2d Cir.2005) (internal quotations and citations omitted). "[T]he lodestar remains useful as a baseline even if the percentage method is eventually chosen," although where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized." *Goldberger,* 209 F.3d at 50. "[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: '(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.' " *Id.* (citation omitted).[10]

■ Employing the percentage method of fixing attorney compensation (while relying upon the lodestar method as a "cross-check"), the Court finds, for the reasons that follow, that 12% of the Settlement Fund, or $9,000,000, is a fair and reasonable fee under *Goldberger* and related cases.[11]

The first *Goldberger* factor relates to "the time and labor expended by counsel." Because the Court is awarding fees on a percentage basis, the Court has not "exhaustively scrutinized" counsel's hourly submissions or their efficiency at performing specific tasks. *Goldberger,* 209 F.3d at

---

**10.** Class Counsel initially claimed to have worked 8,697.38 hours on this case (Pl. Decl.Ex. A), and subsequently claimed to have worked 9,020.75 hours (Pl. Supp. Appendix Ex. 1). Among other things, counsel "conducted an extensive investigative effort in connection with the filing of the Consolidated Complaint," including numerous interviews of potential witnesses; "briefed Defendants' motions to dismiss" as well as objections to the Dismissal R & R; "conducted a review of hundreds of thousands of pages of documents and deposition summaries produced by Elan in connection with the SEC's investigation

. . .; worked with forensic accountants to evaluate the alleged improprieties; . . . consulted with financial experts to determine the damages sustained by the Class and to prepare the Plan of Allocation," and negotiated the Settlement. (Pl. Settl. Mem. at 5; *see* Pl. Fee Mem. at 5; Pl. Decl. ¶¶ 45, 53–56, 61, 66–77.)

**11.** This award is based upon "the unique circumstances of [this] case," *Goldberger,* 209 F.3d at 53, and should not be considered as precedent for any other fee applications submitted to the Court in other cases.

49–50 (district courts need not "undertake the 'cumbersome, enervating, and often surrealistic process' of lodestar computation" (citation omitted)).

During the course of its review, the Court has paid particular attention to Unappointed Counsel's lodestar because, among other reasons, Unappointed Counsel were not selected by the Court to play a role in this case and their efforts do not appear appreciably to have benefitted the Class. *See In re Auction Houses Antitrust Litig.*, No. 00 Civ. 648, 2001 WL 210697, at *4–5 (S.D.N.Y. Feb. 26, 2001). Virtually all of Unappointed Counsel's hours fall into two categories: (1) "Investigation, Initial Pleadings, Consolidated Complaint," and (2) "PSLRA Notice, Lead Plaintiff Motion." (Pl. Supp. Appendix Ex. 1.) But Unappointed Counsel failed to segregate the hours devoted to investigation and/or preparation of the Consolidated Complaint and do not establish why they should be compensated for, among other things, seeking but failing to be appointed lead counsel. *See In re Auction Houses,* 2001 WL 210697, at *4 (denying fees where "none of the applications . . . segregate the time and expenses devoted to carrying out assignments of interim lead counsel from other services"). Plaintiffs' argument in support of Unappointed Counsel's fees that the filing of multiple complaints "demonstrat[ed] to [Elan] the intense outrage experienced by American investors" (Pl. Response at 9) is unpersuasive. *See In re Auction Houses,* 2001 WL 210697, at *4 & n. 7 ("the filing of scores of duplicative class action complaints served no useful purpose"). Accordingly, Class Counsel's $3,174,263 lodestar should, in the Court's view, be discounted by $581,337 (1,596.43 hours), *i.e.,* the combined lodestar of Unappointed Counsel (Pl.Decl.Ex. A), reflecting a revised Class Counsel lodestar of $2,592,926.

Judge Maas's Pretrial Order, dated December 11, 2002, appointing an Executive Committee appears to suggest that some additional counsel may be retained at Lead Counsel's request, *i.e.,* after Lead Counsel's appointment. (*See* Pretrial Order ¶ 11 ("All plaintiffs' counsel shall provide time and expense reports to Plaintiffs' Lead Counsel . . . ."); *see also id.* ¶ 3(b).) Accordingly, the Court has not discounted the fee application of Schiffrin & Barroway, LLP, who appear to have performed substantial work which benefitted the Class. (*See* Pl. Supp. Appendix Ex. 22: Supp. Decl. of Andrew Barroway, dated Dec. 28, 2004.)

As to the second *Goldberger* factor—*i.e.,* "the magnitude and complexities of the litigation"—the Court agrees with Objector Barnes that, although this case was "large and complex" involving a great many separate finance and accounting issues, the factual and legal issues were not exceptionally "novel." (Barnes Mem. at 18; *see* Chalmers Decl. Ex. C: *Wall Street Journal* Article, dated Jan. 30, 2002 (describing many of the allegations later asserted in this case).)

The third *Goldberger* factor—*i.e.,* the risk to counsel of pursuing this case on a contingency basis—is " 'perhaps the foremost' factor to be considered in determining whether to award an enhancement." *See Goldberger,* 209 F.3d at 54 (citation omitted). Plaintiffs assert, unpersuasively in the Court's view, that Class Counsel faced a high risk that (1) Elan would become insolvent or (2) the case would be dismissed. (*See* pages 368–69, *supra.*) Plaintiffs rely upon events that took place long after the lawsuit commenced, even though "[i]t is well-established that litigation risk must be measured as of when the case is filed." *Goldberger,* 209 F.3d at 55; *accord In re Bristol–Myers Squibb Secs. Litig.,* 361 F.Supp.2d 229, 234 (S.D.N.Y.

2005). For example, although Lead Counsel filed their initial complaints in early February 2002, and moved to be appointed Lead Counsel on or about April 5, 2002, the earliest evidence Plaintiffs offer of Elan's financial instability took place months later. (*See* Pl. Response at 13 n. 9 ("issues of Elan's insolvency arose as early as the summer of 2002"); *see also* Pl. Fee Mem. at 18 n. 10 (referring to Elan's financial difficulties in the "six months ended June [30], 2004").)

Class Counsel faced only a modest risk of dismissal at the outset of the case because, among other things, the SEC commenced a parallel proceeding either on February 7, 2002 (contemporaneously with the filing of this action) or March 2, 2002 (over one month before Lead Counsel moved for appointment). (*See* Chalmers Decl. Ex. D; Pl. Decl. ¶¶ 35, 63–64; Pl. Fee Mem. at 4.)[12] "[T]he existence of [a parallel] SEC investigation would certainly have put additional pressure on [Elan] to settle the case, and would also have given plaintiffs' counsel greater reason to believe that they could prevail." *In re Bausch & Lomb, Inc. Secs. Litig.*, 183 F.R.D. 78, 87 (W.D.N.Y.1998). And, the number of law firms filing initial complaints and vying to be appointed lead counsel would seem to confirm counsels' confidence in the outcome.

As to the fourth *Goldberger* factor—*i.e.*, "the quality of representation"—Plaintiffs estimate their possible recovery at $361 million, while Defendants estimate $151 million. (*See* page 371–72, *supra*.) However, "a big recovery does not necessarily justify a quality multiplier." *Goldberger*, 209 F.3d at 56. That "the parties reached a settlement agreement that was executed [contemporaneously with the] settlement of the SEC action suggests that it was the Company's desire, prompted by the SEC, to put its house in order that caused the settlement, not any action on the part of Lead Counsel." *In re Bristol–Myers*, 361 F.Supp.2d at 236.

With respect to the fifth *Goldberger* factor—*i.e.*, "the requested fee in relation to the settlement"—Plaintiffs and Objector Barnes present copious (but divergent) evidence.[13] Case citations notwithstanding, a "fee award should be assessed based on scrutiny of the unique circumstances of each case." *Goldberger*, 209 F.3d at 53.

The Court finds a 12% fee to be reasonable under the circumstances of this case which include, among other factors, modest (contingency fee) risk. *See, e.g., Gold-*

---

12. *See Goldberger*, 209 F.3d at 52 (quoting William S. Lerach to the effect that his firm "achieve[d] 'a significant settlement although not always a big legal fee, in 90% of the cases we file'" (citation omitted)); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318, 2001 WL 709262, at *4 (S.D.N.Y. June 22, 2001) ("What empirical data does exist indicates that all but a small percentage of [securities] class actions settle. . . ."); Chalmers Decl. Ex. B. Elaine Buckberg, Todd Foster, and Stephanie Plancich, Recent Trends in Securities Class Actions Litigation: 2003 Update, *Class Action Litigation*, April 23, 2004(BNA) (80% of PSLRA cases are settled and 19% dismissed).

13. *Compare Goldberger*, 209 F.3d at 52 ("empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%" (citations omitted)); and *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 352–54, 2005 WL 388562, at *28–29 (S.D.N.Y. Feb. 18, 2005) (citing "the 12 to 20% range of reasonable for settlements in the range of $50 to 70 million); *with* Declaration of Marc Gross, dated Jan. 21, 2005 ("Gross Decl."), Ex. K at 167, 170–71, 194; Pl. Resp. at 3 ("[A] survey . . . of all reported fee awards in . . . class actions [*i.e.*, securities and non-securities cases] from 1974 through 2003 determined that fee awards [including expenses] averaged 20.3% of the recovery for cases that settled between $75–$100 million.").

*berger,* 209 F.3d at 53 (affirming fee award of counsel's lodestar but no multiplier, equal to approximately 4% of $54 million settlement); *Denney,* 230 F.R.D. 317, 352–54, 2005 WL 388562, at *28–29 (reducing fee percentage from 20% to approximately 15.5% of $81.5 million settlement, and reducing multiplier from 2.04 to 1.5); *In re Twinlab Corp. Sec. Lit.,* 187 F.Supp.2d 80, 87 (E.D.N.Y.2002) (reducing fee from 33% to 12% of $26.5 million settlement, and reducing lodestar from 3.58 to approximately 1.29). This result balances the "overarching concern for moderation," *Goldberger,* 209 F.3d at 53, with the concern for avoiding "disincentive[s] to early settlements," *Wal–Mart Stores,* 396 F.3d at 123.

The sixth *Goldberger* factor addresses "public policy considerations." Although Lead Counsel argue "that public policy supports granting attorneys fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC, . . . attorneys' fees that amount to more than four times the unscrutinized lodestar figure would provide far more than sufficient encouragement to plaintiffs' counsel, indeed, would provide a windfall, where there appears, at the commencement of the litigation, no more than the usual risk of non-recovery." *In re Bristol–Myers,* 2005 WL 701134, at *6.

The reasonableness of a 12% award, or $9,000,000, is confirmed by a lodestar analysis "cross-check." *Goldberger,* 209 F.3d at 50. Based upon a (revised) lodestar of $2,592,926, a 12% fee award reflects a multiplier of approximately 3.47. *See, e.g., Denney,* 230 F.R.D. at 352–54, 2005 WL 388562, at *28–29 (reducing multiplier on $81.5 million settlement from 2.04 to 1.5); *In re Twinlab,* 187 F.Supp.2d at 87 (based upon $26.5 million settlement, reducing multiplier from 3.58 to 1.29 because, among other things, "post-*Goldberger* courts . . . have generally refused multipliers as high as 2.03").

The Court also finds that Class Counsel's (revised) request for the reimbursement of expenses in the amount of $505,398,33 is reasonable, with the following qualifications: *first,* Glancy, Binkow & Goldberg, LLP acknowledges a $1,900 overcharge (Pl. Supp. Appendix: Ex. 12: Declaration of Lionel Glancy, dated Dec. 22, 2004, ¶ 5(a) n. 1); *second,* for the reasons previously stated (*see* page 17, *supra* ), the Court does not credit the expenses of Unappointed Counsel in the amount of $50,658.06 (*see* Pl. Decl. Ex. A).

### D. *Chalmers's Fee Application*

■■■ Chalmers, who was retained by Objector Barnes on October 26, 2004, requests an award of $121,575 in legal fees (representing an $81,050 lodestar and a 1.5 multiplier) along with unreimbursed expenses of $4,001.41. (Memorandum of Class Member Doyle Barnes in Support of Motion for Fees, dated Feb. 4, 2005 ("Chalmers Fee Mem."), at 1; Fee Declaration of Charles D. Chalmers, dated Feb. 4, 2005.) Chalmers argues, among other things, that he "has presented the Court with references that can assist it in understanding Class Counsel's effort, and in crafting an award that is consistent with the pattern of moderation." (Chalmers Fee Mem. at 1.) Plaintiffs oppose this request arguing that Objector Barnes' arguments opposing Class Counsel's Fee Application were "misplaced," and, "[i]n any event, this Court is certainly capable of making its own assessment of [Class Counsel's] fee request without the 'benefit' of [Objector's] counsel." (Pl. Supp. Response at 2.)

Objector's Counsel "are entitled to an allowance as compensation for attorneys' fees and expenses where a proper showing has been made that the settlement was

improved as a result of their efforts." *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir.1974); *accord In re Independent Energy Holdings PLC Secs. Litig.*, No. 00 Civ. 6689, 2003 WL 22801724, at *1 (S.D.N.Y. Nov. 24, 2003). Chalmers's written and oral presentations were helpful to the Court in assessing and improving the Settlement and Class Counsel's Fee Application. *In re Independent Energy*, 2003 WL 22801724, at *1–2. At the same time, because the Court finds Chalmers's hourly fee to be sufficient compensation (*i.e.*, $500 for each "non-travel hour" and $250 for each "travel hour"), the Court approves his fee application in the amount of $81,050 (*i.e.*, Chalmers's lodestar without a multiplier) and his request for $4,001.41 in expenses. *See Luciano v. Olsten Corp.*, 109 F.3d 111, 117 (2d Cir.1997) ("[A] district court can exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours."); *In re Independent Energy*, 2003 WL 22801724, at *2 (reducing two objectors' counsels' fees by 33% and 50% respectively).

## V. Conclusion and Order

For the foregoing reasons, the motion [110] for final approval of the Settlement is granted; Class Counsel's Fee Application [111] is approved in the amount of $9,000,000 in legal fees and $452,840.27 in expenses; and Chalmers's Fee Application [134] is approved in the amount of $81,050 in legal fees and $4,001.41 in expenses.