Adele BRODY, et al., on behalf of themselves and all others similarly situated, Plaintiffs–Appellees,

v.

Peter S. HELLMAN; Jerry Colangelo; Solomon D. Trujillo; Manuel A. Fernandez; Craig R. Barrett, Dr.; Frank P. Popoff; Marilyn Carlson Nelson; Hank Brown; George J. Harad; Linda G. Alvarado; Qwest Communications International; and Joseph P. Nacchio, Defendants–Appellees,

and

Association of U.S. West Retirees; Eldon H. Graham; Hazel A. Floyd; and Mary M. Hull, Intervenors–Appellants.

No. 05CA2017.

Colorado Court of Appeals, Div. III.

July 12, 2007.

Shuman & Berens LLP, Robert J. Dyer III, Kip B. Shuman, Denver, Colorado; Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Michael J. Dowd, Pamela M. Parker, Laura M. Andracchio, San Diego, California; Milberg Weiss Bershad & Schulman LLP, Jeff S. Westerman, Karen T. Rogers, Los Angeles, California; Weiss & Lurie, Jordan L. Lurie, Los Angeles, Cali-

fornia, Joseph H. Weiss, New York, New York, for Plaintiffs–Appellees.

Curtis L. Kennedy, Denver, Colorado, for Intervenors–Appellants.

Opinion by Judge BERNARD.

In this common fund case, objectors-intervenors, the Association of U.S. West Retirees, Eldon H. Graham, Hazel A. Floyd, and Mary M. Hull, appeal the trial court order awarding attorney fees and costs to lead counsel, Lerach Coughlin Stoia Geller Rudman & Robbins LLP; Dyer & Shuman LLP; Milberg Weiss Bershad Hynes & Schulman LLP; and Weiss & Lurie. We affirm in part, vacate in part, and remand for further proceedings.

## I. Background

The following facts are undisputed. This case arose from events surrounding the June 30, 2000, merger between U.S. West, Inc. and Qwest Communications International, Inc. On June 5, 2000, U.S. West announced that, at a June 2, 2000, meeting, its board of directors had declared a regular dividend for the second quarter of 2000, payable on August 1, 2000, to shareholders of record as of June 30, 2000. In a letter dated June 6, 2000, Qwest CEO Joseph Nacchio demanded that U.S. West either rescind the dividend or set a record date of July 10, 2000 or later. On June 6, U.S. West announced that the June 30 record date was incorrect, and that the actual record date was July 10, 2000. The merger closed on June 30, 2000, and the dividend was never paid.

On June 21, 2000, plaintiff, Adele Brody, on behalf of a class of U.S. West shareholders, filed a complaint against U.S. West and the U.S. West directors, alleging breach of fiduciary duty and breach of contract to pay the dividend, which was valued at $270 million. On January 8, 2001, Brody filed an amended complaint against U.S. West, the U.S. West directors, Qwest, and Nacchio, alleging breach of contract, breach of third–party beneficiary contract, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, and commission of ultra vires acts.

Defendants answered they had no obligation to pay the dividend, because the July 10, 2000, record date fell after the merger, and there were no U.S. West shareholders of record on that date. Defendants also answered that, if they were liable at all, damages were less than half the amount Brody claimed, because if Qwest had paid the dividend, the Qwest stock held by former U.S. West shareholders after the merger would have been worth significantly less.

Thus, the central disputed issues were whether the record date for the dividend was June 30 or July 10, 2000, whether Qwest breached its contractual obligation to pay the dividend, and whether U.S. West breached its fiduciary duty by failing to ensure payment of the dividend.

In March 2001, defendants moved to dismiss the complaint or for summary judgment. The trial court denied the motion. Thereafter, the parties conducted discovery, which consumed the following two years. In September 2002, both parties moved for summary judgment. The trial court denied both motions in July 2003. In September 2003, plaintiffs filed a motion for class certification, which defendants opposed. The trial court granted the motion in January 2005, after which the parties proceeded to prepare for trial. In March and April 2005, the parties participated in two settlement conferences, but were unable to reach an agreement.

Then, in June 2005, on the eve of trial, the parties agreed to cancel the trial and enter into a settlement agreement. The agreement, which they executed on June 20, 2005, established a $50 million settlement fund. Lead counsel requested $15 million in attorney fees, or 30% of the settlement fund, and approximately $1.3 million in costs. Notice of the settlement and of lead counsel's fee request was sent to the 763,333 members of the class.

On August 30, 2005, the trial court held a fairness hearing to determine whether the requested fees and costs were reasonable. The trial court granted the request of three individual members and one organizational member of the class (objectors) to intervene at the hearing to contest the requested amounts. At the end of the hearing, the trial

court granted the full request for attorney fees and costs.

## II. Attorney Fees

Objectors contend the trial court abused its discretion in awarding lead counsel $15 million in attorney fees. We disagree.

■■■ The determination of what constitutes reasonable attorney fees "is a question of fact for the trial court and will not be disturbed on review unless it is patently erroneous and unsupported by the evidence." *Am. Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 384 (Colo.1994)(quoting *Hartman v. Freedman*, 197 Colo. 275, 281, 591 P.2d 1318, 1322 (1979)). Thus, we review the reasonableness of the amount of attorney fees awarded under an abuse of discretion standard. The trial court must make findings sufficient to allow meaningful appellate review of an award. *Yaekle v. Andrews*, 169 P.3d 196, 201, 2007 WL 609872 (Colo.App. No. 05CA1569, Feb. 23, 2007).

■■■ Generally, attorney fees cannot be recovered absent an express statute, court rule, or private contract providing for them. *Hawes v. Colo. Div. of Ins.*, 65 P.3d 1008, 1015 (Colo.2003). The common fund doctrine is an exception to this principle. The doctrine is an equitable remedy that affords fees to attorneys for their advocacy for the benefit of others. It is grounded in equitable principles of quantum meruit and unjust enrichment. "Therefore, a court needs no legislative support to award fees under the common fund doctrine." *Hawes v. Colo. Div. of Ins., supra*, 65 P.3d at 1015–16.

The policy underlying the common fund doctrine was discussed in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (citations omitted):

> [A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.... The [common fund] doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the

fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

Colorado recognizes the common fund doctrine. *Kuhn v. State*, 924 P.2d 1053, 1060 (Colo.1996). In class actions lawsuits where a fund is created for the benefit of the class, either through settlement or judgment on the merits, the doctrine is widely adhered to as a method for proportionately spreading attorney fees among the class members. *Kuhn v. State, supra*, 924 P.2d at 1060 (citing 7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 1803 (1986) ).

■■■ Because a class action lawsuit benefits all class members, and because at least one class member contracts with an attorney to pursue this benefit, "the remaining class members should pay what the court determines to be the reasonable value of the services benefitting them." *Kuhn v. State, supra*, 924 P.2d at 1058 (quoting *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 165 (3d Cir. 1973)). An award of attorney fees from a common fund also "serves to reward counsel for creativity and skill in enlarging a settlement fund beyond what was thought possible or likely at the inception of the case." *In re HPL Techs., Inc. Sec. Litig.*, 366 F.Supp.2d 912, 919 (N.D.Cal.2005).

### A. Fee Agreement

On appeal, the objectors contend the proposed fee award is excessive. In this regard, their Notice of Objection and Request to Intervene indicated lead counsel had not revealed information to support the proposed fee award, including lead counsel's "usual hourly rates, the fee agreement with [the named plaintiff], the tasks performed and the time spent on this case." Objectors also made a general discovery request.

At the hearing to determine whether lead counsel's fee request would be approved, objectors were allowed to intervene and asked the trial court to grant a fee award of $10 million, or twenty percent of the common

fund. The trial court did not enter any prehearing orders denying objectors' request for discovery, and, at the hearing, objectors did not make any requests for discovery; they did not discuss what the effect of any fee agreement should be upon the trial court's analysis; and the trial court did not make any rulings on the request for discovery. The trial court's only comment concerning the existence of a fee agreement was that there was no "prearranged fee .... other than it was going to be a contingency."

There is no fee agreement in the record. At oral argument, lead counsel indicated "there was a written fee agreement with at least one client."

■ Although objectors requested discovery of the fee agreement in their written motion, they did not pursue this issue before the trial court during the hearing on the fee award, nor ask the trial court, during the hearing, to provide them with the fee agreement. Thus, we determine objectors have abandoned this argument. *See Herrera v. Anderson,* 736 P.2d 416, 418 (Colo.App. 1987)("[I]t goes without saying that one who affirmatively seeks relief, such as a continuance, must pursue his request to its disposition before he can complain."); cf. *People v. Fuqua,* 764 P.2d 56, 61 (Colo.1988) ("When the sentencing court fails to act on a timely filed motion for reduction of sentence within a reasonable period of time, it then becomes the defendant's obligation to make reasonable efforts to secure an expeditious ruling on the motion. In the absence of any reasonable effort by the defendant to obtain an expeditious ruling, the motion for reduction should be deemed abandoned.").

■ Even assuming, for purposes of discussion, that objectors had not abandoned their request for discovery of the fee agreement, we would conclude the parameters of any fee agreement would not control the trial court's decision to award fees. In *Spensieri v. Farmers Alliance Mutual Insurance Co.,* 804 P.2d 268, 271 (Colo.App.1990), a division of this court indicated generally that examination of a preexisting fee agreement "may" assist a court in evaluating what the attorney's fee expectations were; "[h]owever, the reasonableness of the fee must still be dem-

onstrated, and the use of such an agreement is only one factor for the court to consider."

Courts from other jurisdictions have reached a similar conclusion in common fund cases. For example, the Florida Supreme Court observed in *Kuhnlein v. Department of Revenue,* 662 So.2d 309, 314 (Fla.1995)(footnote omitted):

> [I]n common-fund cases ... most class members do not enter into written contingency fee agreements with class counsel. As in this case, contingency fee agreements in common-fund cases generally are entered only by the named plaintiffs who are a small portion of the class. Consequently, if the court allowed the written fee agreements to control the fee to be awarded from the common fund, it would be enforcing fee agreements to which the vast majority of class members did not consent.

*Accord Edwards v. Alaska Pulp Corp.,* 920 P.2d 751, 758 n. 15 (Alaska 1996) (courts may consider, "but should not be bound by the percentage in a contingency fee arrangement"; "[t]he percentage figures in lawyers' contingent fee agreements with the class representatives 'are not controlling on the court's determination of fees for the class recovery'" (quoting Alba Conte, *Attorney Fee Awards* 61 (2d ed.1993) ) ); *United Cable Television Ltd. P'ship v. Burch,* 354 Md. 658, 687–88, 732 A.2d 887, 903 (1999)("[W]e hold that the percentage of a contingent fee in the contract between counsel for the Plaintiffs and the named Plaintiffs is not controlling."), *superseded by statute on other grounds as stated in Simpkins v. Ford Motor Credit Co.,* 389 Md. 426, 886 A.2d 126 (2005); *In re Estate of Stull,* 8 Neb.App. 301, 311, 593 N.W.2d 18, 24 (1999) ("In awarding attorney fees out of a common fund, a trial court is not bound by the contract between the attorney and the client."); *Kline v. Eyrich,* 69 S.W.3d 197, 209 (Tenn.2002)("[A]lthough the fee contract with the lead or original plaintiff is relevant to the inquiry, the contract is not determinative of the appropriate fee to be paid by the passive, noncontracting beneficiaries. Instead, trial courts should base any fee award from these beneficiaries upon the reasonable value of the attorney's services

provided to them."); *Plumb v. State,* 809 P.2d 734, 738–39 (Utah 1990) (trial courts are not bound by fee agreement between class representatives and class counsel because of equitable nature of class action cases; trial court must exercise its discretion in determining reasonableness of fee award; "[a]pproval by the trial court is required notwithstanding any agreement between the class representatives and their counsel concerning fees"; trial court's role "is an important vehicle for assuring that the interests of all class members will be thoroughly considered by a neutral party before any ... award is approved").

Here, the record indicates there was at least one fee agreement with one client. However, there were over 763,000 members of the class with whom fee agreements were not negotiated. Lead counsel were entitled to compensation for their efforts on behalf of those class members with whom no fee agreement had been negotiated.

Under *Kuhn v. State, supra; Spensieri v. Farmers Alliance Mutual Insurance Co., supra;* and the cases from other jurisdictions cited above, the trial court could have examined the existing fee agreement. However, its obligation to the members of the class with whom no fee agreement had been negotiated was to determine the reasonableness of the award. Based on this authority, we conclude the trial court was not required to examine the fee agreement when evaluating the reasonableness of the award. Moreover, because we conclude below that the trial court's analysis of the fee award was not an abuse of discretion, we further conclude that examination of the terms of the existing fee agreement would have had little impact on the trial court's evaluation of the reasonableness of the fee award.

Our conclusion does not affect the validity and enforcement of any existing fee agreement negotiated between counsel and any class members. These contracts would be regulated by the Rules Governing Contingent Fees, found in Chapter 23.3 of the Colorado Rules of Civil Procedure, and Colo. RPC 1.5. *See Kuhnlein v. Dep't of Revenue, supra,* 662 So.2d at 314 n. 7.

B. Factors for Determining Reasonableness of Fee Award

 Courts rely on the factors articulated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974), in calculating and reviewing the reasonableness of attorney fee awards under the common fund doctrine. *Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988). The *Johnson* factors are substantially similar to those found in Rule 1.5 of the Colorado Rules of Professional Conduct, which provide a basis for a court's evaluation of whether attorney fees are reasonable, and may also be considered when determining the reasonable value of an attorney's services for recovery based on quantum meruit. *Law Offices of J.E. Losavio, Jr. v. Law Firm of Michael W. McDivitt, P.C.,* 865 P.2d 934, 936 (Colo.App.1993). Accordingly, we employ them here.

 The *Johnson* factors are: (1) the time and labor involved; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) any prearranged fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc., supra,* 488 F.2d at 717–19.

In this case, the trial court made comprehensive findings on the *Johnson* factors. The court found: (1) the time and labor involved was "astronomical"; (2) the case involved hotly disputed factual questions and complicated legal questions on which there was no settled law; (3) lead counsel showed a great deal of skill in preparing the expert witnesses and facing a well–prepared and "extremely talented" opposition at every stage of the case; (4) other employment was clearly precluded; (5) thirty percent had long been considered a reasonable contingent fee; (6) there was no prearranged fee other than an understanding the fee would be contin-

gent on the outcome; (7) the plaintiffs or circumstances did not impose time limits; (8) everyone agreed the settlement was a great result; (9) lead counsel was experienced and reputable; (10) no other attorneys stepped forward to pursue the case; (11) lead counsel worked for five years on behalf of the plaintiffs; and (12) thirty percent was not an extreme fee, considering lead counsel worked for five years with the risk of getting nothing.

■ Objectors do not dispute the trial court's findings with respect to the *Johnson* factors, except for the final factor, awards in similar cases. Instead, they argue the trial court should have reduced the attorney fees because they came to approximately $1,000 per hour per attorney or paralegal. We disagree.

### 1. Significance of Hourly Rate

■ The rationale for awarding a percentage of the fund to attorneys in common fund cases is the same as the rationale for permitting contingency fee arrangements in general. *In re Combustion, Inc.*, 968 F.Supp. 1116, 1132 (W.D.La.1997). The size of the contingent fee is designed to be greater than the reasonable value of the services, or the hours worked multiplied by the hourly rate, to reflect the fact that attorneys will realize no return for their investment of time and expenses in cases they lose. *In re Combustion, Inc.*, *supra*, 968 F.Supp. at 1132 (citing F. MacKinnon, *Contingency Fees for Legal Services* 28 (1964)). Thus, because payment is contingent upon receiving a favorable result for the class, attorneys should be compensated both for services rendered and for the risk of loss or nonpayment assumed by following through with the case. *In re Combustion, Inc.*, *supra*, 968 F.Supp. at 1132 (citing 1 Conte, *Attorney Fee Awards*, *supra*, § 1.09).

There are two methods for calculating attorney fees in a common fund case where there is no prearranged contingent fee: the lodestar method and the percentage method. In the lodestar method, the court multiplies the number of hours the attorneys reasonably worked by the reasonable hourly rate for that work to determine the lodestar. The

court may then multiply the lodestar by a factor to compensate the attorneys for the risks they faced and any other special circumstances. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 (3d Cir.2005). In contrast, in the percentage method, as its name suggests, the court simply awards the attorneys a percentage of the common fund. *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir.2003).

Many federal courts have addressed the propriety of using the percentage method instead of the lodestar method in calculating attorney fees in common fund cases. *See, e.g.*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47–51 (2d Cir.2000); *Rawlings v. Prudential–Bache Props., Inc.*, 9 F.3d 513, 515–16 (6th Cir.1993); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 772–74 (11th Cir.1991). There are recognized advantages and disadvantages to each method, although the more recent trend has been toward using the percentage method in common fund cases. *Gottlieb v. Barry*, 43 F.3d 474, 482 (10th Cir.1994). *See generally Court Awarded Attorney Fees*, 108 F.R.D. 237, 254–59 (1986) (report of Third Circuit task force recommending use of percentage method in common fund cases).

Typically, courts use the percentage method and then crosscheck the adequacy of the resulting fee by applying the lodestar method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir.2005); *In re Bristol–Myers Squibb Sec. Litig.*, 361 F.Supp.2d 229, 233 (S.D.N.Y.2005).

In this case, the trial court used the percentage method, and then crosschecked the fee against the result under the lodestar method. Objectors do not argue this approach was improper. Instead, they focus on the amount of attorney fees awarded, $15 million, and the number of hours lead counsel worked, 15, 770.22. They divide the attorney fees by the hours worked and conclude the figure, which comes to approximately $1,000 per hour per attorney or paralegal, should have shocked the conscience of the court. However, as explained above, a contingent fee is designed to be greater than the reasonable value of the services.

The $15 million attorney fee award constituted 30% of the common fund. Lead counsel's lodestar was $6,501,148.75, which was calculated by multiplying each attorney's or paralegal's hours worked by their hourly rate, and then adding those figures. Thus, dividing the fee under the percentage method, $15 million, by the lodestar, $6,501,148.75, shows a multiplier of approximately 2.3 times the reasonable value of the services.

Under the lodestar crosscheck method, the $15 million dollar award was not only based upon hours worked and an hourly fee, but also upon a multiplier designed to reward the attorneys for being willing to assume the risks associated with taking on the responsibility of a case like this. We therefore reject objectors' argument that the fee award shocks the conscience, as the $1,000 per hour figure postulated by the objectors does not accurately characterize the components of the award. Thus, we conclude the trial court did not abuse its discretion in declining to reduce the attorney fees to reflect a lower hourly rate.

As we will now explain, these figures were well within the range of reasonable attorney fees in common fund cases.

## 2. Comparison of Awards in Similar Cases

Objectors argue awards in similar cases indicate the trial court should have awarded far less than 30% of the common fund. We disagree.

There is no general rule of what percentage of a common fund may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case. *Mashburn v. Nat'l Healthcare, Inc.*, 684 F.Supp. 679, 692 (M.D.Ala.1988). However, many courts have awarded between 20% and 30%, with very few awarding more than 50%. *In re Crazy Eddie Sec. Litig.*, 824 F.Supp. 320, 326 (E.D.N.Y.1993). Other courts view 25% as the benchmark that courts should award in common fund cases. *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir.1995).

Objectors assert this case is out of line with attorney fee awards in similar "megafund" cases. However, it is questionable whether the settlement in this case, although undeniably large, can be characterized as a "megafund." The cases on which objectors rely as "megafund" cases all involved settlements in excess of $300 million. *See In re Bristol–Myers Squibb Sec. Litig., supra,* 361 F.Supp.2d at 229; *Duhaime v. John Hancock Mut. Life Ins. Co.,* 989 F.Supp. 375 (D.Mass.1997); *In re Prudential Ins. Co. Sales Practices Litig.,* 962 F.Supp. 572 (D.N.J.1997) *(Prudential I), aff'd in part, rev'd in part, and vacated in part,* 148 F.3d 283 (3d Cir.1998) *(Prudential II).*

Objectors' reliance on *Prudential I, supra,* for the proposition that percentage awards in megafund cases range from 4.1% to 17.92% of the common fund is misleading, because there the court's survey of attorney fee awards was confined to cases where the settlements exceeded $100 million. *See Prudential I, supra,* 962 F.Supp. at 585; *see also In re Copley Pharm., Inc.,* 1 F.Supp.2d 1407, 1413 (D.Wyo.1998)(attorney fees in the range of 610% of a common fund are appropriate when the fund exceeds $75 million, even though the usual range for common fund cases is 2030%, because larger cases do not automatically require more legal work than smaller cases, and application of the higher percentages to the larger funds would result in a windfall for attorneys).

Objectors argue *In re Bristol–Myers Squibb Securities Litigation, supra,* 361 F.Supp.2d 229, in which the court awarded approximately $12 million in attorney fees out of a $300 million settlement, or 4% of the common fund, militates in favor of reducing the attorney fees. In that case, the court awarded only about half the amount the attorneys requested because the attorneys did not face an unusual degree of risk or expend an extraordinary effort in pursuing the action, the facts and legal theories were not complicated, and the lodestar figure resulted in a reasonable multiplier of 2.29. *In re Bristol–Myers Squibb Sec. Litig., supra,* 361 F.Supp.2d at 234–37.

In this case, the trial court found lead counsel faced an extremely high degree of risk and expended an extraordinary effort in pursuing the action, and the facts and legal theories were very complicated. It is also

worthy to note the lodestar multiplier applied in *Bristol–Myers Squibb* was nearly identical to the lodestar multiplier in this case.

Objectors also argue *Prudential II, supra,* indicates the attorney fees in this case should have been reduced. In *Prudential* II, the court remanded the fee award in a settlement of upward of $1 billion. However, the court relied heavily on the fact that the trial court had improperly credited the attorneys with creating the entire value of the settlement, when much of the benefit was created by a multistate life insurance task force organized to investigate the allegations against the defendant. *Prudential II, supra,* 148 F.3d at 338.

Unlike the attorneys in *Prudential II,* lead counsel in this case did all the legwork themselves, without the aid of a government investigation. *Compare In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 597 (S.D.N.Y.1992)(awarding the attorneys 30% of a $34 million settlement: "[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own.").

Our review of comparable settlements reveals the percentage of the common fund awarded in this case was reasonable. *See In re Rite Aid Corp. Sec. Litig., supra* (awarding $31.6 million, or 24%, attorney fees on a $126.6 million settlement); *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir.2002) (awarding $27 million, or 28%, attorney fees on a $97 million settlement); *In re Telectronics Pacing Sys., Inc.,* 137 F.Supp.2d 1029 (S.D.Ohio)(awarding $17 million, or 27%, attorney fees on a $62 million settlement), *clarified,* 148 F.Supp.2d 936 (S.D.Ohio 2001); *In re Combustion, Inc., supra,* (awarding $46 million, or 36%, attorney fees on a $127 million settlement); *In re Crazy Eddie Sec. Litig., supra* (awarding $14.2 million, or 34%, attorney fees on a $42 million settlement). *See generally Shaw v. Toshiba Am. Info. Sys., Inc.,* 91 F.Supp.2d 942, 972 (E.D.Tex.2000)(observing that attorney fees in the range of 2533% have been routinely awarded in class actions: "Empirical studies show that, regardless whether the percent-age method or the lodestar method is used, fee awards in class actions average around one–third of the recovery."); *Edwards v. Alaska Pulp Corp., supra,* 920 P.2d at 758 n. 14 ("While acceptable percentage awards have ranged from under 10% to 50%, the consensus seems to be that 20% to 30% (or 19% to 33%) is normally reasonable. The median and the most common figure seems to be 25% of the fund." (citations omitted) ).

As for the lodestar cross–check, a multiplier of 2.3 times the lodestar is well within the range of fees customarily awarded in complex litigation. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986)(awarding 2.0 multiplier); *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 549 (S.D.Fla.1988)("In cases as complex as this, with risks of establishing liability as great as in this case, and with legal representation as fine as it was here, a lodestar multiple of three appears to be average."), aff'd, 899 F.2d 21 (11th Cir.1990); *In re MGM Grand Hotel Fire Litig.,* 660 F.Supp. 522 (D.Nev.1987)(awarding multipliers from 1.0 to 2.95); *In re Beverly Hills Fire Litig.,* 639 F.Supp. 915 (E.D.Ky.1986) (awarding multipliers from 1.0 to 5.0); *Squillacote v. United States,* 626 F.Supp. 127 (E.D.Wis.1985) (awarding 3.0 multiplier); *Brewer v. S. Union Co.,* 607 F.Supp. 1511 (D.Colo.1984)(awarding multipliers from 2.0 to 4.0).

Thus, we conclude the trial court did not abuse its discretion in awarding lead counsel 30% of the common fund.

### 3. Success of the Settlement

██ Objectors argue the $50 million settlement was only a fraction of the $270 million potential liability. Thus, in their view, while the settlement was reasonable, it was not a "home run," and therefore the trial court should have reduced the attorney fees. We disagree.

██ A settlement, by definition, is a not a complete victory: a settlement is a compromise that is reached by the parties after they have made an assessment of the risks, expenses, and delay of further litiga-

tion. *Williams v. Vukovich,* 720 F.2d 909, 922 (6th Cir.1983). A settlement reflects the fact that each side gets less than its maximum objective. *Antrim v. Burlington N., Inc.,* 847 F.2d 375, 378 (7th Cir.1988); *see Berkley v. United States,* 59 Fed.Cl. 675, 680 (2004) ("Settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." (quoting *Prudential II, supra,* 148 F.3d at 316–17)). Thus, the fact that the common fund here was a product of a compromise between the $273 million in damages plaintiffs were seeking and defendants' complete denial of liability does not, in itself, suggest the attorney fee award should have been reduced.

At the fairness hearing, objectors acknowledged lead counsel's tremendous efforts of their behalf, and the difficulty of extracting any money at all from such "formidable" opponents as U.S. West and Qwest. The trial court concurred with objectors' assessment in evaluating the success of the settlement: "And today we have nobody, nobody coming forward who's saying, this settlement was not reasonable. The objector says, this was a great result. And it was a great result. So there is no doubt."

Thus, the trial court did not abuse its discretion in declining to reduce the attorney fees because plaintiffs recovered less in the settlement than they were seeking had the case gone to trial.

#### 4. Oversight of Billing Records

■ Objectors argue none of the plaintiffs scrutinized lead counsel's billing records on a regular basis, giving them little incentive to maximize efficiency, and therefore, the trial court should have reduced the attorney fees. We disagree.

The percentage of the fund method rewards efficiency, not inefficiency, because inefficiently expended hours only serve to reduce the per hour compensation of the attorneys working them. *See In re Copley Pharm., Inc., supra,* 1 F.Supp.2d at 1411 (the lodestar method encourages attorneys to bill as many hours as possible).

· Objectors rely on *Jane L. v. Bangerter,* 61 F.3d 1505 (10th Cir.1995), for the proposition

that an attorney must keep meticulous time records that "reveal ... all hours for which compensation is requested and how those hours were allotted to specific tasks." *Jane L. v. Bangerter, supra,* 61 F.3d at 1510 (quoting *Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir.1983)). However, neither Jane L. nor Ramos was a common fund case; both were civil rights cases in which fees were sought pursuant to statute 42 U.S.C. § 1988.

In statutory fee–shifting cases, courts require more detailed proof of hours worked because fee–shifting removes the interest a paying client would have in ensuring that the attorney is serving the client economically. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 722, 107 S.Ct. 3078, 3085, 97 L.Ed.2d 585 (1987). Thus, the lodestar method is generally employed in calculating attorney fees in statutory fee–shifting cases. *In re Gen. Motors Corp.,* 55 F.3d 768, 821 (3d Cir.1995).

■ While the time billed by the attorneys in a common fund case is relevant to the court's inquiry into the reasonableness of the percentage, there is no requirement that the plaintiffs or the court scrutinize billing records. *See In re Copley Pharm., Inc., supra,* 1 F.Supp.2d at 1411 ("[I]t is much easier and far less demanding of scarce judicial resources to calculate a percentage of the fund fee than to review hourly billing practices over a long, complex litigation."); *In re Gulf Oil/ Cities Serv. Tender Offer Litig., supra,* 142 F.R.D. at 597 ("[I]t is impossible for a judge who does not undertake a full–scale audit to give reliable assurance that time has been fairly accounted for and expenses fairly incurred. In a large case, such an examination is out of the question.").

■ In addition, where, as here, the lodestar method is used as a mere crosscheck of the percentage method, the court does not need to scrutinize exhaustively the hours documented by counsel. *Goldberger v. Integrated Res., Inc., supra,* 209 F.3d at 50; *see In re Rite Aid Corp. Sec. Litig., supra,* 396 F.3d at 306–07 (the court may rely on summaries submitted by the attorneys and need not review actual billing records; "[t]he lodestar crosscheck calculation need entail nei-

ther mathematical precision nor bean–counting").

In this case, lead counsel prepared a fifty-six–page report summarizing their position as to the *Johnson* factors and the reasonableness of the fees requested. Counsel included a lengthy record listing, by law firm, and by individual attorney or paralegal, the number of hours worked, the hourly rate for each, and the resulting lodestar. The trial court considered this information in determining the requested fees were reasonable.

Thus, the trial court did not abuse its discretion in declining to reduce the attorney fees because plaintiffs did not scrutinize lead counsel's billing records.

### 5. Compliance with Contingent Fee Rules

■ Objectors argue the attorney fees were unreasonable because there was no disclosure of the fee agreement, and no compliance with Rule 1.5(c) of the Colorado Rules of Professional Conduct (Colo.RPC) or chapter 23.3 of the Colorado Rules of Civil Procedure. We disagree.

Colo. RPC 1.5(c) allows for contingent fees except in cases where they are prohibited, but states that such fees shall meet all the requirements of chapter 23.3.

■ Chapter 23.3 specifically requires that a contingent fee agreement set forth in writing the amount of compensation to which the attorney shall be entitled, expressed as a percentage of the proceeds received by the client, and the amount the client must pay for expenses. C.R.C.P. ch. 23.3, Rule 1, 5; *Elliott v. Joyce*, 889 P.2d 43, 45 (Colo.1994). An attorney who fails to comply with chapter 23.3 may not enforce payment by clients. C.R.C.P. ch. 23.3, Rule 6; *Elliott v. Joyce, supra*, 889 P.2d at 45.

■ Objectors' reliance on chapter 23.3 is misplaced. Generally, an attorney may seek a contingent fee from his client only in accordance with a valid agreement. *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 446 (Colo.2000). The purpose of chapter 23.3 is to regulate contingent fee agreements carefully, *Fasing v. LaFond*, 944 P.2d 608, 611 (Colo.App.1997), because court approval of the agreements is not required

before they are executed. *Bryant v. Hand*, 158 Colo. 56, 58, 404 P.2d 521, 523 (1965).

■ However, in this case, lead counsel is not seeking a contingent fee from plaintiffs based on a private contract. The common fund doctrine is an exception to the rule requiring an express statute, court rule, or private contract authorizing an attorney to recover fees. *See Hawes v. Colo. Div. of Ins., supra*, 65 P.3d at 1015. In a common fund case, the court takes on the role of fiduciary for the beneficiaries of the fund when awarding attorney fees. *Brown v. Phillips Petroleum Co., supra*, 838 F.2d at 456. Thus, the court's oversight at the fairness hearing provides protection to the beneficiaries comparable to that the regulations in C.R.C.P. ch. 23.3 provide to plaintiffs in ordinary contingent fee cases.

■ In any event, even where there is a preexisting fee agreement between the attorney and client, the agreement is not determinative in evaluating whether the fee is reasonable. *See Spensieri v. Farmers Alliance Mut. Ins. Co., supra*, 804 P.2d at 271 (in statutory fee case, court considered existence of preexisting contingent fee agreement as one factor in fashioning award).

Thus, the trial court did not abuse its discretion in awarding attorney fees although there was no preexisting fee agreement that complied with Colo. RPC 1.5 and C.R.C.P. ch. 23.3.

### III. Costs

■ Objectors contend the trial court abused its discretion in charging the settlement fund certain undocumented costs and expenses. We agree.

■ We review an award of costs for an abuse of discretion and will only disturb the award if it is manifestly arbitrary, unreasonable, or unfair. *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo.2004).

■ Expenses are compensable in a common fund case if the particular costs are the type typically billed by attorneys to paying clients in the marketplace. *Bratcher v. BrayDoyle Indep. Sch. Dist. No. 42*, 8 F.3d

722, 725–26 (10th Cir.1993). However, attorneys are not entitled to reimbursement of costs where the request is for an amount that is "excessive or otherwise noncompensable." *In re Bausch & Lomb, Inc. Sec. Litig.,* 183 F.R.D. 78, 89 (W.D.N.Y.1998)(quoting *In re Fleet/Norstar Sec. Litig.,* 974 F.Supp. 155, 158 (D.R.I.1997)). Thus, as in any case, attorneys in a common fund case have the burden to persuade the court that the costs requested are reasonable and equitable. *In re Bausch & Lomb, Inc. Sec. Litig., supra,* 183 F.R.D. at 89.

In this case, the trial court awarded $1,335,714.56 in costs. Objectors dispute the following portions of that award: $105,114.04 for computer research; $168,754.76 for meals, hotels, and travel; and $105,032.52 for photocopying. They assert lead counsel failed to provide documentation for these costs, other than the amount requested in each category by each law firm.

Lead counsel respond their sworn declaration to the court—that all the requested expenses were properly incurred—is sufficient, considering they explained in great detail their efforts over the five years of litigation. They argue objectors point to no facts indicating their expenses were not properly incurred.

■■■ Lead counsel is incorrect that the burden is on objectors to show the costs were not reasonable. A party seeking costs must provide the court with sufficient information and supporting documentation to allow a judge to make a reasoned decision for each cost item presented. *City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,* 105 P.3d 595, 627 (Colo.2005). *Compare Am. Water Dev., Inc. v. City of Alamosa,* 874 P.2d 352, 389–90 (Colo.1994) (upholding award of costs where party provided billing statements and testimony to demonstrate witness fees were necessary and reasonable), *with Fenton v. Fibreboard Corp.,* 827 P.2d 564, 569–70 (Colo. App.1991) (setting aside award of costs where party did not provide documentation indicating how costs had been incurred or that they were necessary and reasonable), *aff 'din part and rev'd in part on other grounds,* 845 P.2d 1168 (Colo.1993).

■■■ A party seeking to recover computerized legal search costs must show: (1) the client was billed for computerized legal research expenses separate from attorney fees; (2) the computerized legal research was necessary for trial preparation; and (3) the requested costs were reasonable. *Mackall v. Jalisco Int'l, Inc.,* 28 P.3d 975, 977–78 (Colo. App.2001); *Roget v. Grand Pontiac, Inc.,* 5 P.3d 341, 347–48 (Colo.App.1999). Similarly, a party seeking to recover hotel, meals, and travel expenses or photocopying costs must demonstrate the costs were necessary and reasonable. *Fed. Ins. Co. v. Ferrellgas, Inc.,* 961 P.2d 511, 515 (Colo.App.1997).

In this case, lead counsel did not provide documentation to support their requests for computerized research costs, hotels, meals, and travel expenses, or photocopying costs, other than to list the total amount requested in each category by each law firm.

■■■ In addition, the opposing party is entitled to have the trial court make findings sufficient to disclose the basis for its decision to award costs and to support the amount awarded. *Van Steenhouse v. Jacor Broad. of Colo., Inc.,* 935 P.2d 49, 56 (Colo.App.1996), *aff 'din part and rev'd in part on other grounds,* 958 P.2d 464 (Colo.1998). Absent such findings, a reviewing court cannot adequately assess the propriety of the trial court's award. *Van Steenhouse v. Jacor Broad. of Colo., Inc., supra,* 935 P.2d at 56.

In this case, the trial court did not review the requested costs to determine whether they were reasonable. At the fairness hearing, the court simply stated:

> I think the expenses are reasonable. I find counsel to be honest and if they tell me that's what the expenses [were], I believe [th]em. Most of those expenses were the $400,000 to give notice [to the class]. The $250,000 to pay for the experts [was] absolutely essential. So I find that the expenses are reasonable and necessary in this case.

In *Fed. Ins. Co. v. Ferrellgas, Inc., supra,* the trial court, without holding a hearing, awarded costs in the precise amount the prevailing party requested. The bill of costs consisted of broad categories of alleged costs

and a total dollar amount for each, including expert witness fees, travel expenses, photocopying costs, service of process fees, and telephone charges. The party did not provide, and the court did not require, any documentation indicating any of these costs had in fact been incurred, or that they were necessary and reasonable. In its order, the court concluded without discussion that the costs were necessary and reasonable. *Fed. Ins. Co. v. Ferrellgas, Inc., supra,* 961 P.2d at 515.

A division of this court vacated the award of costs, because, absent evidence from the party seeking costs and findings from the trial court, it could not determine whether the award was proper. The division remanded the case to the trial court for a hearing on the necessity and reasonableness of the disputed costs and a ruling that contained findings sufficient to permit appellate review. *Fed. Ins. Co. v. Ferrellgas, Inc., supra,* 961 P.2d at 515.

Like the division in *Ferrellgas,* we cannot determine whether the award of costs was proper in this case, because lead counsel did not provide documentation to support their requests for costs, and the trial court did not make findings on whether the costs were necessary and reasonable.

Accordingly, the order awarding costs is vacated as to the disputed items, and the case is remanded to the trial court for a hearing on the necessity and reasonableness of the costs for those items. The order awarding costs and attorney fees is otherwise affirmed.

ROY and NIETO *, JJ., concur.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2006.